**SECOND DIVISION**
**BARNES, P. J.,**
**MCFADDEN and MCMILLIAN, JJ.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
(Court of Appeals Rule 4 (b) and Rule 37 (b), February 21, 2008)
http://www.gaappeals.us/rules/

**March 22, 2013**

# In the Court of Appeals of Georgia

A12A2237. GRAHAM v. THE STATE.

BARNES, Presiding Judge.

Erica Lashae Graham was indicted for four counts of felony murder, two counts of cruelty to children, aggravated assault, aggravated battery, and making false statements to the police after her three-month-old baby died while in her care. A jury convicted her of four counts of voluntary manslaughter instead of felony murder and of all the remaining charges. The trial court merged the violent offenses into one voluntary manslaughter conviction and sentenced Graham to serve twenty years in prison, followed by five years in prison on the charge of making false statements. She appeals, contending that the evidence was insufficient to sustain the convictions. For the reasons that follow, we agree that the evidence was insufficient to sustain the voluntary manslaughter convictions and therefore reverse them. We conclude,

however, that the evidence was sufficient to affirm the convictions for aggravated assault, aggravated battery, cruelty to children, and making false statements. Accordingly, we affirm in part, reverse in part, vacate the sentence, and remand for resentencing in accordance with this opinion.[1]

Viewed in the light most favorable to the verdict, the evidence established that on January 6, 2009, police and emergency medical technicians found Graham's three-month-old baby dead shortly after Graham called 911 at 9:44 p.m. Graham gave conflicting accounts of the events preceding the baby's death, first telling police that she lived alone with the baby and her other daughter at their apartment, that she had picked up the baby from the baby's father earlier that evening at a gas station, that she had no contact information for the father, and that she had put the baby to sleep in her playpen when she came home. However, Graham actually lived with the baby's father, whom she initially misidentified to the police. The father had put the baby to bed around 5:30 p.m. and left the apartment around 7:00 p.m. that evening, leaving Graham alone with the baby and the couple's two-year-old daughter.

---

[1]Graham has not challenged the sufficiency of the evidence regarding her conviction for making a false statement.

2

Graham's neighbor testified that she heard a knock at her door around 9:30 p.m. the night the baby died, but no one was there when she answered it. She heard crying in Graham's apartment and knocked on her door. Graham opened the door and asked if she could use the neighbor's cell phone because "her baby had died." The neighbor retrieved her cell phone from her own apartment, gave it to Graham, and followed her upstairs to the baby's room. Graham called someone and asked if he or she had seen "Mitchell," who was later identified as the baby's father, and the neighbor "let her know" she needed to end that conversation and call 911.

Graham then called 911 at 9:42 p.m. and gave the phone to the neighbor to speak to the dispatcher, who advised the neighbor to perform CPR on the baby. The neighbor testified that she felt no pulse and that the baby was cold, so she did not try to resuscitate her. Later that evening, the neighbor saw an unsent message in her cell phone's outbox to an unfamiliar number. The message read, "If they asked, Justin was the father."

A police officer who was dispatched to the scene with the paramedics testified that the baby was lying face up on the floor in an upstairs bedroom when they arrived at 9:48 p.m. She had no apparent injuries, and because the death appeared to be from natural causes, the officer covered her with a blanket and began interviewing Graham

3

in anticipation of completing a standard deceased person report. Graham told the officer that she had picked up the baby from his father, "Justin Wallace," at a gas station at 5:15 p.m. that day, although she later admitted that she lied about the father's name. The child had been born prematurely and because her breathing was loud and labored, Graham told the officer that she knew the baby was alive when she picked her up from the father and put her to bed at 5:30 p.m., even though she was asleep. She also heard the baby breathing when she checked on her at 7:00 p.m., but when she checked again around 9:30 p.m., she heard nothing and the baby was cold.

After a paramedic confirmed that the baby had passed away, the officer testified, Graham seemed upset for the first time and told the officer she did not know what the baby and father had been doing during the day. Graham could not provide the officer with contact information for the baby's father. A forensic investigator from the Gwinnett County Medical Examiner's office responded to the scene and also interviewed Graham. Graham again lied and said the child's father was "Justin Wallace" and that he had kept the child at his apartment in Lawrenceville that day. She said she did not know his address because he had just moved, and he did not have a telephone. She told the investigator that she picked up the child from the father at

a gas station and took her home, then recounted the rest of the evening as she had to the police officer.

The medical examiner performed an autopsy the next day. She testified that, although the only external sign of injury was a small hemorrhage in the baby's left eye, an internal examination revealed multiple lateral and posterior rib fractures, some as old as three weeks and others closer in time to her death. These fractures were not accidental, but were caused by someone squeezing the baby's chest. The baby's femur had been broken from trauma such as grabbing or pulling the leg, also around the time she died. Further examination revealed swelling in her brain, retinal hemorrhages in both eyes, and subdural hematomas and clotted blood under her skull, which were markers for the type of injury she had suffered. In the examiner's opinion, the brain injury was caused by a significant rotational force from either an impact or a shaking, and the baby died "within minutes to hours" of receiving the trauma that caused her death.

Graham's mother called the medical examiner's investigator the day of the autopsy and correctly identified the child's father as Mitchell Siegler, not Justin Wallace, as Graham said the night the baby died. Graham's mother told the investigator that Graham and the father had moved into the apartment together five

days before the baby died, and that the father had been present earlier that evening. She also called the detective assigned to the case "to clear up the whole story," and told him that Graham had lied about the father's identity because the father was on probation and she did not want him to get in trouble. She testified that the Department of Family and Children's Services had become involved with the family when the baby was born prematurely with marijuana in her system, and that the baby had issues with her underdeveloped lungs. After two months in the hospital, the baby was released on December 12, 2008, to live with Graham and Graham's mother. Graham was supposed to "get herself together, get off drugs," and she and the baby's father traded off taking care of the baby and her sister.

Both grandmothers testified that they had seen red spots in the whites of the baby's eyes at the end of December 2008 and had encouraged Graham and the father to take the child to a doctor. The father's mother, who worked at a daycare facility, testified that she had seen the baby twice the day she died. At lunch she had been alert and later that afternoon she was asleep in the car. She knew the baby was alive then because she could hear her loud, raspy breathing.

The father testified that he and Graham had two children, and that he had taken care of the baby all day. After he dropped off Graham at work, he took the children

6

by a friend's house, as he often did, and visited for a while. The friend testified that nothing stood out about the children, except that the baby "used to breathe kind of funny." The father took the older child to daycare, where his mother worked, then brought lunch to the child and to Graham at work, did errands, went home and fed the baby, picked up the older child, and then picked up Graham from work. They all went home, and the father put the sleeping baby to bed and turned on the baby monitor to listen for her while the parents were downstairs. He and Graham then had a "heated conversation" about who would cook dinner and about him leaving the house that evening, which he did around 7:00 p.m. He visited two different friends, both of whom testified about his visit, and around 10:00 p.m. that evening his brother called the second friend to inform the father of the baby's death.

The day after the baby died, a DFCS caseworker located the baby's sister and took her into custody. At a hearing the next day, Graham tested positive for marijuana. In contrast to her initial statements to the medical examiner investigator and the detective, Graham told the caseworker that the father had put the baby to bed around 5:30 p.m. and then left the apartment on the night she died. In a phone call from jail after her arrest, Graham said to the father, "The bitch labeled this shit a homicide the very next day," and said she "wasn't expecting anyone to get locked up

7

until the autopsy was done." After the autopsy, when the detective told her the extent of the baby's injuries, Graham showed no shock or surprise, and when the detective commented on her response, she became a little combative for the first time and said she did not like the way he was coming at her.

A pediatrician testified as an expert for Graham and disagreed about the timing of the injury that caused the baby's death. In his opinion, the baby died from trauma that occurred 24 to 48 hours earlier during "at least two periods of time when somebody angrily grabbed the chest of this baby." The pressure from squeezing the baby's chest abruptly increased the baby's central venous pressure, which caused her brain to swell slowly and led to the brain damage that caused her death.

After hearing the conflicting testimony, the jury found Graham guilty of four counts of voluntary manslaughter instead of felony murder, two counts of cruelty to children, and one count each of aggravated assault, aggravated battery, and making false statements to the police. Graham moved for a new trial, the trial court denied the motion, and this appeal followed.

1. Graham contends that the evidence did not support her voluntary manslaughter conviction. A person commits voluntary manslaughter by causing "the death of another human being under circumstances which would otherwise be murder

and if [she] acts solely as the result of a sudden, violent, and irresistible passion resulting from serious provocation sufficient to excite such passion in a reasonable person." OCGA § 16-5-2 (a). Graham argues that a three-month-old baby could hardly commit the "serious provocation" necessary to excite such passion, and that not even slight evidence supported the jury charge on voluntary manslaughter requested by the State.

In reviewing the evidence necessary to sustain a conviction, appellate courts apply the standard of review set out in *Jackson v. Virginia*, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979) and determine "'whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *State v.Clay*, 249 Ga. 250 (1) (290 SE2d 84) (1982). When a defendant is indicted for murder and convicted of voluntary manslaughter, "if the [S]tate's evidence fails to prove the crime charged in the indictment or a lesser included offense, the conviction must be reversed." Id. at 251. A voluntary manslaughter conviction may be affirmed if the defendant was indicted for murder, the evidence "absolutely demanded" a verdict of murder, and "some little evidence" sufficiently authorized a charge and conviction of voluntary manslaughter, *Robinson v. State*, 109 Ga. 506 (34 SE 1017) (1900);

9

*Varnum v. State*, 125 Ga. App. 57, 62063 (186 SE2d 485) (1971). Later cases have held that if the evidence was sufficient to sustain the indicted offense of murder and the State introduced at least slight evidence of provocation, the voluntary manslaughter conviction may be affirmed. Id.; *Goins v. State*, 164 Ga. App. 37, 38 (1) (296 SE2d 229) (1982). Regardless of which standard is used, here, there was no evidence of sudden provocation by the baby to support a voluntary manslaughter conviction. See *Holmes v. State*, 162 Ga. App. 717, 718 (293 SE2d 16) (1982) (absent evidence of provocation, voluntary manslaughter conviction reversed). "In this case, involving a three-[month]-old victim, there was no evidence of any 'serious provocation' sufficient to excite 'sudden, violent, and irresistible passion in a reasonable person.' " *Arnett v. State*, 245 Ga. 470, 472 (1) (265 SE2d 771) (1980). See also *Paul v. State*, 274 Ga. 601, 605 (3) (b) (555 SE2d 716) (2001) (10-year-old victim's "backtalk" while being struck was insufficient provocation to justify voluntary manslaughter charge).

The State argues, however, that sufficient evidence supports the voluntary manslaughter conviction for the homicide of the baby as an unintended victim, based on the concept of "transferred intent," such as when a defendant shoots at someone

as a result of serious provocation but misses and kills a bystander. See *McLendon v. State*, 172 Ga. 267 (4) (157 SE 475) (1931); *Coker v. State*, 209 Ga. App. 142, 143 (433 SE2d 637) (1993); but see *Foster v. State*, 264 Ga. 369, n. 2 (444 SE2d 296) (1994) (questioning whether concept of transferred intent from intended victim to third-party is still valid under current felony murder statute).

The State's theory at trial was that Graham's anger at the father was transferred to the baby and "manifested itself in grabbing and shaking the baby too hard[,] causing the injuries that resulted in the baby's death."

Regardless of whether the concept of transferred intent is still valid, however, in this case the only evidence arguably involving provocation of any kind was the father's testimony that he and Graham had a "heated conversation" before he left on the evening the baby died. When asked if he and Graham had an argument or fight before he left that night, the father responded, "It wasn't an argument, but we did have – we had a heated conversation. It wasn't an argument." The father testified that when Graham asked him why he had to go out, he asked if she wanted to pack up the kids and come with him, and she replied, "No, no, no, that's okay. You just go, just go," and so he left.

We have held that "'a heated conversation' or argument" following a car accident was sufficient provocation to affirm a voluntary manslaughter conviction when the defendant claimed he acted in self-defense. *Asbury v. State*, 175 Ga. App. 335, 336 (1) (333 SE2d 194) (1985). But even if we were to conclude that this evidence was sufficient to establish that Graham was angry with the father for leaving her alone with the children after she had worked a full day, there is no evidence to support the inference that Graham was so angry at the father that she acted out of an irresistible passion and killed the baby, or that she committed murder that was mitigated by provocation. The jury was simply left to speculate on this issue.

Because the State presented no evidence of provocation, we must reverse Graham's voluntary manslaughter convictions.

2. Graham also contends that the evidence was insufficient to sustain her convictions of cruelty to children, aggravated assault, and aggravated battery, arguing that the circumstantial evidence did not rule out the reasonable hypothesis that the baby's injuries were caused by the father. The indictment charged her with committing aggravated assault by using her hands against the baby offensively and causing trauma to her brain, committing aggravated battery by rendering her brain

12

useless, and committing cruelty to children by maliciously and with criminal negligence causing her excessive physical pain.

"To warrant a conviction on circumstantial evidence, the proved facts shall not only be consistent with the hypothesis of guilt, but shall exclude every other reasonable hypothesis save that of the guilt of the accused." OCGA § 24-4-6. When it meets this test, circumstantial evidence is as probative as direct evidence. *Christmas v. State*, 171 Ga. App. 4, 7 (2) (318 SE2d 682) (1984).

> To sustain the judgment of conviction, the evidence need not exclude every inference or hypothesis except guilt of the accused, but only reasonable inferences or hypotheses, so as to justify the inference, beyond reasonable doubt, of guilt. Questions as to reasonableness generally are to be decided by the jury which heard the evidence and where the jury is authorized to find that the evidence, though circumstantial, was sufficient to exclude every reasonable hypothesis save that of guilt, the appellate court will not disturb that finding, unless the verdict of guilt is unsupportable as a matter of law.

(Citations and punctuation omitted.) *Fitz v. State*, 201 Ga. App. 83, 85-86 (410 SE2d 186) (1991).

The State presented evidence that Graham lied about living with the father, about the father's name, and about where the baby had been that day. Several

13

witnesses testified that the baby's breathing was loud and the father said he turned the baby monitor on when he put the baby to bed, but Graham said she did not know anything was wrong until she checked on the baby about two hours later and she was cold. She knocked on a neighbor's door but did not wait for her to answer, then when the neighbor came over with a phone, Graham did not call 911 right away, but called someone else first. She did not seem surprised when the detective told her that the autopsy had uncovered extensive internal injuries to the baby, and said in a phone call from jail that she had not expected anyone to be locked up until after the autopsy. The baby had been in her care for more than two hours when she died, and in the medical examiner's opinion, the baby would have died "within minutes or hours" after she suffered the brain injury.

The issue in circumstantial evidence cases is not whether someone else might have committed the crimes in question. *Daugherty v. State*, 283 Ga. App. 664, 667 (1) (a) (642 SE2d 345) (2007). The issue is whether the circumstantial evidence presented was sufficient to authorize the jury to conclude that the only reasonable hypothesis was that Graham was guilty. *Smith v. State*, 257 Ga. 381, 382 (359 SE2d 662) (1987).

The mere possibility that an individual other than the defendant committed the crime is not such a "reasonable hypothesis" that must be excluded for circumstantial evidence to authorize a guilty verdict. Whether or not in a given case circumstances are sufficient to exclude every reasonable hypothesis save the guilt of the accused is primarily a question for determination by the jury.

(Citation and punctuation omitted.) *McCombs v. State*, 306 Ga. App. 64, 66 (2) (701 SE2d 496) (2010). "Because the factfinder has heard the witnesses and observed them testify, it is considered more capable of determining the reasonableness of the hypothesis produced by the evidence or lack thereof than is an appellate court." *McClain v. State*, 301 Ga. App. 844, 847 (1) (689 SE2d 126) (2010).

In this case, based on the evidence presented, the jury was authorized to conclude that the circumstantial evidence excluded any reasonable hypothesis except Graham's guilt of aggravated assault, aggravated battery, and cruelty to children, and therefore we affirm those convictions.

Accordingly, the judgment is affirmed in part and reversed in part, the sentence is vacated, and the case is remanded to the trial court for further proceedings consistent with this opinion.

*Judgment affirmed in part, reversed in part, vacated and remanded for resentencing. McFadden J., concurs. McMillian, J., concurs in judgment only.*