**FIRST DIVISION**
**PHIPPS, C. J.,**
**ELLINGTON, P. J., and BRANCH, J.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules/

**February 21, 2014**

# In the Court of Appeals of Georgia

A13A1983. KING v. THE STATE.

BRANCH, Judge.

Eddie James King was tried by a Morgan County jury and found guilty of one count of possession of cocaine with intent to distribute[1] and one count of possession of cocaine with intent to distribute within 1,000 feet of a public park.[2] He now appeals from the denial of his motion for a new trial arguing that the evidence is insufficient to sustain his conviction. King further contends that that the trial court erred in failing to grant his motion to disclose the identity of a confidential informant used to make

---

[1] OCGA § 16-13-30 (b).

[2] OCGA § 16-13-32.5 (a). The jury acquitted King of the charge of possession with intent to distribute within 1,000 feet of a public housing project.

a drug buy at King's residence and that he received ineffective assistance of counsel. We find no error and affirm.

"On appeal from a criminal conviction, the defendant is no longer entitled to a presumption of innocence and we therefore construe the evidence in the light most favorable to the jury's guilty verdict." (Citation omitted.) *Marriott v. State*, 320 Ga. App. 58 (739 SE2d 68) (2013). So viewed, the record shows that in approximately March 2008, the Morgan County Sheriff's office received information that King was selling drugs out of his home in Madison. After learning that King was living alone, was unemployed, and was without any known means of support, agents with the sheriff's office and the Ocmulgee Drug Task Force began surveillance of King's residence, and on April 1, 2008, law enforcement sent a confidential informant ("CI") to make a controlled buy of cocaine at King's house. The person who sold the cocaine to the CI, however, was not King, but a man the CI identified only as "Black." According to police, "Black" was later identified as King's nephew, Lamar Jonigans.

Based on information obtained during their investigation and surveillance of King's home, several law enforcement agents accompanied King's probation officer

to King's house on April 10, 2008.[3] When the probation and law enforcement officers arrived at King's home, King was sitting in the carport area with another male, later identified as Jonigans, and Carla White, King's then-girlfriend, was inside the house. Captain Kenny Stewart, a narcotics investigator with the sheriff's office, testified that he knew King from past narcotics investigations and that when Stewart appeared at the residence King recognized him and "became extremely nervous." Stewart explained to King that police had received reports that King was selling drugs out of his house and asked King for permission to search the residence. King gave his consent to search and also consented to a search of his person. During the search of King's person, officers found $239 cash, in small denominations. Stewart testified, based on his training and experience in narcotics investigations, that it was typical for a person who was selling drugs to individuals to carry a large amount of cash in small bills, because such a person frequently had to "make change."

After King consented to the search of his house, he became even more nervous. According to Stewart, King appeared dizzy, his stomach became upset, and he

_____

[3] As a special condition of his probation, King had signed a waiver of his fourth amendment rights, pursuant to which he agreed to submit to a search of his person or his residence "without a search warrant, whenever requested to do so by a Probation Officer or other law enforcement officer upon reasonable cause to believe that [King was] in violation of probation or otherwise acting in violation of the law."

defecated in his pants. Additionally, when it became apparent that officers were going to search the home, King's nephew fled from the carport on foot.[4]

During the search, officers found both powder and crack cocaine located inside a tin canister sitting on top of the kitchen cabinets. The powder cocaine, which weighed approximately 3.35 grams, was packaged in 16 small bags, while another bag contained 4 or 5 rocks of crack cocaine, weighing a total of .87 grams. Stewart stated that based on his training and experience as a narcotics investigator, the total amount of cocaine found in King's house was greater than the typical amount that would be held by an addict or regular user of the drug, as those people did not generally have the financial means to obtain that quantity of cocaine at one time. Rather, the total amount of cocaine and the way in which it was packaged indicated that the drugs belonged to a dealer – i.e., someone who was selling the drug to third parties. Stewart also explained that powder cocaine was a "unique item" in the Madison area and the only person he knew of in the area that sold cocaine in powder form was King.

Brian Moore, an officer with the Ocmulgee Drug Task Force, also participated in the search of King's residence and testified at trial. He confirmed that after King

---

[4] Officers immediately apprehended the nephew and charged him with obstruction.

consented to the search, he appeared to be extremely nervous; Moore explained that King could not carry on a normal conversation, was stuttering, could not make eye contact, and soiled himself. Like Stewart, Moore opined that the amount of cocaine found in King's house and the way in which it was packaged indicated that the drugs were the property of a dealer who was planning to sell them to third parties.

When the cocaine was discovered, King insisted that the drugs did not belong to him but instead belonged to White. According to the investigating officers, however, White, who is approximately 5'5", would have been unable to access the drugs easily, as they were located on top of cabinets ending approximately seven to seven and one-half feet above the floor. Conversely, King, who is approximately 6'2" tall, could have reached the drugs by stretching and extending his arms. Moreover, Stewart and King's probation officer were both familiar with White, and both men knew White to be a "hard core" drug addict, but did not know her as someone who sold drugs. Nevertheless, officers arrested both King and White and charged each of them with possession with intent to distribute.

White testified at King's trial and admitted that she was a drug addict who was attempting to overcome her addiction[5] and that her drug of choice was powder cocaine. According to White, she met King when she began buying drugs from him in 2001, and she soon began a sexual relationship with him. She stated that she had received cocaine from King on a number of occasions; sometimes she purchased the drugs from King and other times he gave her the drugs. White had also seen King sell cocaine to other people on numerous occasions. With respect to the incident in question, White confirmed that at the time, King was the only person living in his house. She explained that prior to April 10, 2008, she had been living in Monroe, "away from" King, for approximately three weeks, in an attempt to become drug-free. On April 9, however, King sent his niece to pick up White in Monroe and bring her back to Madison; King told White that he "had something for [her]," and she knew that the "something" referred to cocaine. She spent the night with King, who provided her with two or three small bags of cocaine. The next morning, before police arrived, she also purchased a small quantity of cocaine from King. That same morning, White saw King make two separate sales of crack cocaine to an unidentified man.

---

[5] White testified that at the time of trial in October 2010, she had been drug-free since May 2009.

6

White further testified that because of her serious cocaine addiction, King generally hid his supply of cocaine from her and would never trust her with large quantities of the drug. Rather, when King gave her cocaine, he always had it on his person. White also stated that although she had a small amount of cash with her on the morning of April 10, she was at the time unemployed and without the financial resources to obtain the amount of cocaine found in King's house.

The State also introduced similar transaction evidence showing that in December 2002 law enforcement began an investigation into reports that King was selling powder cocaine out of his house.[6] After performing two controlled buys of small quantities of cocaine from King, officers obtained a search warrant for King's residence. When they executed that warrant, the police found five small, individually wrapped bags of powder cocaine. King was subsequently charged with possession with intent to distribute, and he pled guilty to that charge in April 2003. Additionally, the State introduced evidence showing that following his arrest on the charges at issue, King offered to identify for police his supplier, who he claimed was known as "Red."

---

[6] This house was the same residence out of which King was accused of selling drugs in this case.

He had law enforcement officers drive him to Athens, where he pointed out a tire and rim shop and stated that he purchased his cocaine from Red at that location.

At his trial on the current charges, King testified in his own defense and acknowledged that he owned the house where the drugs were found and that he was the only person who had a key to the residence. He nevertheless denied ownership of the drugs or knowledge that they were in his house. King also testified that White was living with him in his house in April 2008, and that she was using drugs at the time.[7] According to King, he had never sold cocaine to White, although he had purchased the drug from other people and given it to White. Additionally, King claimed that the money police found in his pocket came from a construction job he was working. He could not explain why his probation officer testified that King was unemployed, as the probation officer had visited King at the job site. King explained his conversations with police where he identified his supplier as "Red," by saying they were "payback." Specifically, King stated that he felt like police had "played with" him by claiming the drugs in question belonged to King, and King therefore "felt like [he would] return the favor" and "play with" the officers by taking them "on a wild goose chase."

---

[7] King's sister, who testified as a defense witness, also stated that White was living with King at the time the drugs were discovered.

8

Following his conviction, King filed a motion for a new trial. The trial court denied that motion and King now appeals from that order.

1. King asserts that the evidence is insufficient to sustain his convictions because the State failed to prove that he possessed the drugs found in his kitchen.[8] With respect to this claim of error,

> the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. In determining that question, we consider the inferences that can be logically derived from the evidence presented at trial. As long as there is some competent evidence, even though contradicted, to support each fact necessary to make out the State's case, the jury's verdict will be upheld.

(Punctuation and footnote omitted.) *Wade v. State*, 305 Ga. App. 819, 821 (701 SE2d 214) (2010).

---

[8] To convict King of possession with intent to distribute, the State was required to prove that he possessed the cocaine at issue with the intent to distribute it to other people. See OCGA § 16-13-30. To convict him of possession with intent to distribute within 1,000 feet of a public park, the State was also required to prove that King's house was within 1,000 feet of such a park. See OCGA § 16-13-32.5 (a). On appeal, King does not dispute that his home is located less than 1,000 feet from a public park.

King contends that the State relied solely on circumstantial evidence to prove its case and its proof was therefore required "to exclude every other reasonable hypothesis save that of" King's guilt." OCGA § 24-14-6. The State failed to meet this burden, King argues, because the evidence supported his equal access defense – i.e., the hypothesis that the drugs belonged to either White or Jonigans. We disagree.

King's argument ignores the fact that White's testimony that she obtained cocaine from King on the evening of April 9 and morning of April 10, and that she saw King make two separate sales of cocaine to a third party on the morning of April 10, constitutes direct evidence. See *Allen v. State*, 286 Ga. App. 469, 470 (1) (649 SE2d 583) (2007) (girlfriend's testimony that drugs found during police search of the house she shared with defendant belonged to defendant and that she had seen defendant sell drugs from the house was direct evidence). More importantly, King's argument fails to acknowledge that "[t]he issue in circumstantial evidence cases is not whether someone else might have committed the crimes in question. The issue is whether the circumstantial evidence presented was sufficient to authorize the jury to conclude that the only reasonable hypothesis was that [the defendant] was guilty." (Citations omitted) *Graham v. State*, 320 Ga. App. 714, 720 (2) (740 SE2d 649) (2013). See also *Daugherty v. State*, 283 Ga. App. 664, 667 (1) (a) (642 SE2d 345)

10

(2007) ("[t]o warrant a conviction on circumstantial evidence, the proved facts need exclude only *reasonable* hypotheses – not bare possibilities that the crime could have been committed by someone else") (citation and punctuation omitted; emphasis in original). Moreover,

> [q]uestions as to the reasonableness of hypotheses are generally to be decided by the jury which heard the evidence and where the jury is authorized to find that the evidence, though circumstantial, was sufficient to exclude every reasonable hypothesis save that of guilt, that finding will not be disturbed unless the verdict of guilty is insupportable as a matter of law. [And] it is for the jury to resolve conflicts in the evidence and questions of witness credibility, not this Court.

(Citations and punctuation omitted.) *Hayes v. State*, 292 Ga. 506, 509 (739 SE2d 313) (2013). See also *Bussey v. State*, 263 Ga. App. 56, 58 (1) (a) (587 SE2d 134) (2003) ("whether the defendant's evidence of equal access sufficiently rebuts the inference" that the defendant possessed contraband found in a residence he owned and/or controlled "is a question for the jury") (punctuation and footnote omitted).

Here, after hearing the evidence and having the opportunity to judge the credibility of the witnesses, the jury concluded that the only reasonable hypothesis was that King possessed the drugs found hidden in his kitchen. Because the evidence supports this conclusion, we will not disturb the jury's judgment. See *Reid v. State*,

11

298 Ga. App. 889, 890-891 (1) (681 SE2d 671) (2009) (evidence supported defendant's conviction for possession with intent to distribute where the drugs were found in defendant's apartment and the State offered similar transaction evidence showing defendant's "course of conduct in selling cocaine") (citations omitted); *Allen*, 286 Ga. App. at 470 (1) (evidence sufficient to convict defendant of possession with intent to distribute where drugs were found in residence he shared with girlfriend and girlfriend testified drugs belonged to defendant). See also *Wade*, 305 Ga. App. at 822 ("the mere fact that [defendant] testified he had no knowledge of the drugs did not require the jury to acquit him").

2. Prior to trial, King filed a motion to require the State to disclose the identity of the CI who made the controlled buy of cocaine at King's residence. Following a hearing, the trial court denied that motion, and King contends that ruling was error.

The decision as to whether "a confidential informant's identity is discoverable rests within the sound discretion of the trial court." (Punctuation and footnote omitted.) *Strozier v. State*, 314 Ga. App. 432, 435 (1) (724 SE2d 446) (2012). And in making this decision the court must engage in a two-step process. First, the court must hold a hearing and receive evidence as to whether the confidential informant is an alleged witness to or participant in the crime "whose testimony appears to be material

12

to the defense on the issue of guilt or punishment"; whether "the testimony for the prosecution and the defense is or will be in conflict"; and whether "the confidential informant [is] the only available witness who could amplify or contradict the testimony of these witnesses." (Footnote omitted.) *Turner v. State*, 247 Ga. App. 775, 777 (2) (544 SE2d 765) (2001). It is the movant who bears the burden of establishing "the relevance, materiality, and necessity of the identity of the informant as a predicate for disclosure," *Browner v. State*, 265 Ga.App. 788, 792 (2) (595 SE2d 610) (2004), and if the movant carries this burden the trial court must then "conduct an in camera hearing of the informant's testimony and balance the public interest in protecting the flow of information against the defendant's right to prepare his defense." (Footnote omitted.) *Turner*, 247 Ga. App. at 777 (2).

As King acknowledges in his brief, the controlled buy made by the CI was not the subject of the prosecution and the CI was neither a witness to nor a participant in the crimes for which King was on trial. He nevertheless argues that he was entitled to discover the CI's identity because the CI's testimony was relevant to his equal access defense. Specifically, King contends that testimony that someone other than King was selling drugs out of King's residence would have supported his claim that the drugs found in his kitchen did not belong to him. We have previously rejected a similar

13

argument, finding that under circumstances such as these the defendant failed to show the relevance and materiality of the CI's testimony. See *Turner*, 247 Ga. App. at 777 (2). In *Turner* police had received information from a confidential informant that the CI could "buy cocaine from Turner at Turner's house." Id. at 775. The CI thereafter made two controlled purchases of cocaine from Turner's residence, although there was no evidence that Turner was the person making these sales. Police then obtained a search warrant for the home and, while executing the warrant, police discovered 22 small bags of crack cocaine. Id. at 776. Turner mounted an equal access defense, based on the fact that three other adults either lived or had been in the house on the day police executed the warrant. He therefore sought the identity of the CI on the grounds that his testimony regarding the controlled buys would be relevant and material to this defense. The trial court denied that motion and this Court affirmed, explaining:

> Turner was indicted for possessing with intent to distribute the cocaine found in his living room. He was not charged with selling cocaine to the confidential informant. The informant was not present during the search and arrest and was neither a participant in nor a witness to the specific offense with which Turner was charged. His testimony would not have been material to the issue of Turner's guilt or punishment. Thus, the threshold requirements of the first step of the inquiry were not met, and

14

> the trial court did not err in refusing to require the [S]tate to reveal the informant's identity.

Id. at 777 (2). The same rationale applies here, and the trial court did not abuse its discretion in finding that the testimony of the CI regarding the controlled buy made in this case was neither relevant nor material to the issue of whether King possessed the drugs found hidden in his kitchen.

Moreover, assuming that evidence of the controlled buy was relevant to King's defense of equal access, the CI was not the only witness qualified to testify regarding that buy. Moore worked with the CI on the controlled buy and monitored the transaction, and he testified regarding that buy at the motion hearing. Moore's testimony shows that he was competent to testify as to the fact that someone other than King sold cocaine to the CI. Accordingly, King also failed to demonstrate the necessity of the CI's testimony.

3. King contends that he received ineffective assistance of counsel. To prevail on such a claim, King bears the burden of proving both that the performance of his lawyer was deficient and that he suffered prejudice as a result of this deficient performance. *Strickland v. Washington*, 466 U. S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984). If King cannot meet his burden of proving either prong of the

*Strickland* test, then we need not examine the other prong. *Battles v. State*, 290 Ga. 226, 229 (2) (719 SE2d 423) (2011). Here, we find that King failed to establish that his lawyer's performance was deficient.

The sole ground for King's ineffective assistance claim is that trial counsel failed to question Stewart and Moore regarding the controlled buy of cocaine at King's residence, including the fact that it was Jonigans, rather than King, that sold the drugs. As trial counsel explained at the motion for new trial hearing, however, this decision was a strategic one. Specifically, the lawyer explained that the State had not introduced any evidence regarding the controlled buy and he feared introducing such evidence would open the door to testimony about other drug transactions (suspected or actual) that police had witnessed during their surveillance of King's house. And evidence that law enforcement had observed a number of actual or suspected drug transactions at King's residence would have undermined King's sole defense – i.e., that he was unaware the drugs were in his house.

Given the strategic nature of trial counsel's decision, it "can provide no grounds for [an ineffective assistance claim] unless it was so patently unreasonable that no competent attorney would have chosen it." (Citation and punctuation omitted.) *Mantooth v. State*, 303 Ga. App. 330, 336 (1) (b) (693 SE2d 587) (2010). And it is

16

King who bears the burden of rebutting the strong presumption that this strategy was a reasonable one, made in the exercise of reasonable professional judgment. *Thornton v. State*, 301 Ga. App. 784, 793 (4) (689 SE2d 361) (2009). In light of trial counsel's testimony regarding the reasons underlying his decision, King cannot carry this burden. See *Blocker v. State*, 265 Ga. App. 846, 850 (4) (c) (595 SE2d 654) (2004) (attorney's decision to refrain from impeaching witness on cross-examination because he feared it would open the door to additional evidence, unfavorable to his client, constituted a reasonable strategic decision); *Dorsey v. State*, 265 Ga. App. 597, 600-601 (2) (a) (595 S.E.2d 106) (2004) (trial counsel made a reasonable strategic decision not to call two potentially exculpatory defense witnesses because he was afraid that "their testimony 'could open the doors to a lot of other questions [that would be harmful to the defendant] if somebody slipped up and said something they shouldn't have said'").

*Judgment affirmed. Phipps, C. J., and Ellington, P. J., concur.*