**FIRST DIVISION**
**PHIPPS, C. J.,**
**ELLINGTON, P. J., and MCMILLIAN, J.**

**NOTICE: Motions for reconsideration must be**
***physically received*** **in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules/**

**March 26, 2015**

# In the Court of Appeals of Georgia

A14A1568. TAYLOR v. THE STATE.

MCMILLIAN, Judge.

Travis Taylor was indicted jointly with Shawn Kitchens, Edward Collier, Shamarques Watkins, and Jerald Johnson on two charges of aggravated assault and one charge each of murder, felony murder, participation in criminal street gang activity, and possession of a firearm during the commission of a felony. These charges arose out of a confrontation that erupted into crossfire on July 27, 2010 in Macon, Georgia. Tavish Faulks and Rodrion[1] Gary were shot during that incident, and Gary's injuries were fatal. Collier and Watkins, who was also injured in the

---

[1] Gary's first name is spelled as "Rodrion" in the indictment, the transcript of the hearing on the motion for new trial, and the trial court's order on that motion, but it was spelled as "Rodgeren" in the trial transcript. We adopt the first of these spellings.

incident, each entered guilty pleas before the jury was selected and sworn, and Johnson entered a guilty plea at trial during the second day of testimony. Taylor and Kitchens were tried jointly, and the jury convicted both men on the charges of aggravated assault, possession of a firearm during the commission of a felony, and participation in criminal street gang activity. The jury also convicted Kitchens on the charge of felony murder but acquitted him of malice murder. Taylor was acquitted of any murder charges. The Supreme Court of Georgia recently affirmed Kitchens' convictions in *Kitchens v. State*, __ Ga. __ (Case No. S14A1369, decided Jan. 20, 2015). Taylor now appeals his convictions, following the trial court's denial of his motion for new trial.

Viewed in the light most favorable to the verdict,[2] the evidence at trial showed that the "Unionville Crips" (a/k/a the "Westside Crips") and "Bloomfield" (a/k/a the "Black Team") were rival Macon gangs. At the pertinent time, Collier lived with his wife at 2696 Village Green Lane, off Bloomfield Road in Macon. The day of the shooting, Collier told Tamiko Waller that "Unionville [was] coming to invade Bloomfield." Collier then drove his van to retrieve Taylor, Watkins, Kitchens, Kitchen's cousin, "P-Dub," and another man and brought them back to his house,

---

[2] *Jackson v. Virginia*, 443 U.S. 307 (99 SCt 2781, 61 LE2d 560) (1979).

2

which was in the Bloomfield neighborhood. Kitchens, Watkins, Taylor,[3] and P-Dub were identified at trial as associating with the Unionville Crips. When Collier picked the men up that day, Taylor was carrying a little black tote bag. Following the shooting, that bag was found in a shed behind Collier's house, with a gun inside.

Collier and his wife, who was known as the "Candy Lady," ran a business out of their house selling chips, candy, cold drinks, and cigarettes; people came to their back porch to purchase these items. Taylor, Kitchens, Watkins, and Johnson stayed at the Colliers' house that afternoon, playing cards in the backyard. Waller and her friend Jakira Slaughter were also at the Colliers' house that day. At some point, Tavish Faulks and Emanuel Stroud[4] came to the Colliers' house to purchase cigars. After they arrived, Waller saw one of the Unionville men pull out a gun and put it in his lap. Faulks testified that while he was still on the porch, he saw Kitchens and everyone but Taylor with their guns out and visible. Other people associated with Bloomfield came to the street in front of the Colliers' house, and when Waller saw the "Bloomfield boys" arrive, she believed that "something was about to go wrong."

---

[3] However, Watkins testified that Taylor was not associated with the Crips; instead, he had just been invited to "chill" with the others that day.

[4] Faulks, Gary (the murder victim), and Stroud were identified as associating with Bloomfield.

After Faulks and Stroud made their purchases and left the Colliers' back porch, Kitchens confronted Stroud about a MySpace post in which Stroud had referred to Kitchens as a "crab," a term Stroud used when he did not like someone. Kitchens challenged Stroud to fight him and later told the others in his group, "If [Faulks] jumps in, shoot." The evidence indicated that Faulks tried to defuse the situation by urging Stroud to walk away, which he did. When Collier overheard the argument begin, he told Stroud, Faulks, and Kitchens to take their dispute elsewhere. Although they began to move away, shooting erupted before they left the property. After one person began shooting, Collier said "the rest of them started running and shooting" When the shooting began, Waller and her friend ran inside the Colliers' house and hid. Collier heard approximately seven to eight gunshots; Faulks said he heard about seventeen shots. During the exchange of gunfire, Faulks was hit in the head and wrist, Watkins was shot in the foot, and Gary, who had arrived on the scene, was shot in the chest and killed.

Collier, Watkins, Waller, and Slaughter all stated that they saw Taylor with a gun at the time of the shooting. Waller said that after the shooting ended, she saw Taylor come into the Colliers' house holding a gun and wiping it off on his shirt. Although at trial, Faulks said that he saw everyone but Taylor with a gun on his lap

4

before the shooting began, he admitted that he told police shortly after the shooting, that Taylor had a gun that day, a chrome .380. The State presented forensic evidence that 380-caliber semi-automatic shell casings were found in the Colliers' yard.

Detective Sedrick Pinson of the Macon Police Department's Gang Investigation Unit testified about the Unionville Crips and Bloomfield gangs. He said that gangs in Macon were not like the "Girl Scouts of America." They engaged in activities involving acts of violence, such as murder, shootings, drive-by shootings, and car jackings. He described social media websites such as MySpace as "the fuel that sparks the energy" for the violence between gang members and said that in almost every major gang-related case, the police investigated social media outlets.

Additionally, Collier testified that bringing Taylor and the others to his home had been "wrong," and had "started [the] whole thing." Watkins testified that it was "not a very smart idea" and was also "quite dangerous" to go into Bloomfield territory because the Unionville Crips and Bloomfield do not get along.

1. Taylor first asserts that his convictions for the aggravated assault of Rodrion Gary, possession of a firearm during the commission of a felony, and participation in criminal street gang activity should be set aside and a directed verdict of not guilty entered because jeopardy as to those charges attached when he was found not guilty

5

of malice murder and felony murder. Thus, he contends that his other convictions subjected him to double jeopardy. But the prohibition against double jeopardy is not implicated in this case. No successive prosecution of the same offense occurred; rather, Taylor was tried for all the crimes in the same prosecution in accordance with OCGA § 16-1-8 (a). Similarly, the case presents no issue of multiple convictions for crimes included in one another. See *Williams v. State*, 288 Ga. 7, 8 (2) (700 SE2d 564) (2010) (setting forth the three governmental abuses against which the bar against double jeopardy was designed to protect); See OCGA § 16-1-7 (a) (allowing prosecution, but not conviction for each crime arising from the accused's conduct, if one crime is included in the other).

But although Taylor framed his enumeration in the language of double jeopardy, the gist of his argument is that the verdict is inconsistent and/or contains mutually exclusive results. "However, since Georgia rejected the 'inconsistent verdict rule" in *Milam v. State*, 255 Ga. 560[, 562] (2) (341 SE2d 216) (1986), a defendant cannot attack as inconsistent a jury verdict of guilty on one count and not guilty on a different count." (Punctuation omitted.) *Coleman v. State*, 286 Ga. 291, 295-296 (4) (687 SE2d 427) (2009) (upholding conviction for possession of a firearm during commission of aggravated assault where he was acquitted of aggravated assault). See

6

also *Lawrence v. State*, 274 Ga. 794 (2) (560 SE2d 17) (2002) (upholding conviction for possession of a firearm in commission of a felony of murder even though defendant was acquitted of murder).

Moreover, Taylor has failed to demonstrate that this case falls into the recognized exception to this rule, which arises "when instead of being left to speculate about the unknown motivations of the jury the appellate record makes transparent the jury's reasoning why it found the defendant not guilty of one of the charges[.]" *Turner v. State*, 283 Ga. 17, 20-21 (2) (655 SE2d 589) (2008). Although Taylor argues that by acquitting him of the murder charges the jury must have accepted his defense of justification, nothing in the record demonstrates that the jury made such a finding. Rather, the verdict form in this case "shows no more than 'guilty' or 'not guilty' as to each count of the indictment," and thus fails to elucidate the jury's reasoning. *Lee v. State*, 300 Ga. App. 214, 218 (2) (684 SE2d 348) (2009). And this Court may not speculate about the jury's reasoning.

> [A]ppellate courts cannot know and should not speculate why a jury acquitted on one offense and convicted on another offense. The reason could be an error by the jury in its consideration or it could be mistake, compromise, or lenity. . . . [A]n individualized assessment of the reason for the inconsistency would be based either on pure speculation, or

7

would require inquiries into the jury's deliberations that the courts generally will not undertake.

(Citations and punctuation omitted.) *Turner*, 283 Ga. at 20 (2). Therefore, we find no basis for reversal on this ground.

2. Taylor also asserts that the evidence was insufficient to support his convictions. In considering that argument, the issue before us "is not whether an acquittal on one charge would logically necessitate acquittal on another charge on which the jury convicted the defendant; rather, the . . . question is whether the evidence viewed in favor of the conviction was sufficient to support the guilty verdict." (Citations and punctuation omitted.) *State v. Robinson*, 275 Ga. App. 117, 118 (619 SE2d 806) (2005).[5]

(a) *Aggravated Assault* – As previously noted, our Supreme Court has affirmed Kitchens' convictions for the felony murder and aggravated assault in this case.

---

[5] Moreover, to the extent Taylor is asserting that the trial court erred in refusing to grant a new trial on what is commonly called "the general grounds," we note that on appeal, "this court can only review the case under the standard espoused in *Jackson*[, 443 U.S. 307], to determine if the evidence, when viewed in the light most favorable to the prosecution, supports the verdict." (Citation and punctuation omitted.) *Lewis v. State*, 296 Ga. 259, 261 (3) (765 SE2d 911) (2014).

Taylor argues that because no one testified that they saw him shoot a gun, the evidence must show that he actually did something in aid of the actual shooters in order to sustain his conviction for aggravated assault.

The jury was charged that Taylor could be convicted as a party to the crime of aggravated assault. "A party to a crime is one who intentionally aids or abets the commission of the crime, or intentionally advises, encourages, hires, counsels, or procures another to commit the crime. OCGA § 16-2-20 (b) (3), (4)." (Citation omitted.) *Wright v. State*, 296 Ga. 276, 284 (3) (766 SE2d 439) (2014). And "[w]hether a person is a party to a crime may be inferred from that person's presence, companionship, and conduct before, during, and after the crime." (Citation and punctuation omitted.) *Conway v. State*, 281 Ga. 685, 687 (1) (642 SE2d 673) (2007). Additionally, "it is the jury's duty as factfinder to weigh the evidence presented at trial and to determine the credibility of the witnesses. It is not obligated to believe any witness, and it may accept or reject any portion of a witness's testimony." *McKinney v. State*, (Citation omitted.) 293 Ga. App. 419, 420-421 (1) (667 SE2d 210) (2008).

Here, the jury could have concluded that Taylor accompanied the others to Collier's house with the intent to invade the Bloomfield neighborhood and that he brought a gun with him in his black bag for that purpose. His co-defendants and other

witnesses testified that he had a gun at the time of the shooting, supporting an inference that he displayed the gun, even if he did not shoot it, in response to Kitchens' instructions to shoot if Faulks "jump[ed] in." After the shooting, he came into the house, wiping off the gun. Even if the record contains no direct evidence indicating Taylor shot his gun, the circumstantial evidence was sufficient to convict him as a party to the crime of aggravated assault as to both Faulks and Gary. *Luke v. State*, 324 Ga. App. 531, 532 (2) (751 SE2d 180) (2013). And the issue of whether this circumstantial evidence excluded any reasonable hypothesis other than Taylor's guilt was for the jury. *Graham v. State*, 320 Ga. App. 714, 720-721 (2) (740 SE2d 649) (2013).

"Likewise, the issues of witness credibility and justification are for the jury to decide, and the jury is free to reject a defendant's claim that he acted in self-defense." *White v. State*, 287 Ga. 713, 715 (1) (b) (699 SE2d 291) (2010). Further, contrary to Taylor's argument, we find more than sufficient evidence to corroborate the testimony of his co-defendants. "Slight evidence from an extraneous source identifying the accused as a participant in the criminal act is sufficient corroboration of the accomplice to support a verdict." (Citation and punctuation omitted.) *Threatt v. State*, 293 Ga. 549, 551 (1) (748 SE2d 400) (2013).

(b) *Possession of a firearm* – Taylor does not specifically argue that the evidence was insufficient to support his conviction for possession of a firearm during the commission of a felony, which the indictment alleged as felony or malice murder. However, we find that the same evidence that supported his conviction as a party to the crime of aggravated assault would have been sufficient to find him guilty as a party to the crime of felony murder, even though the jury did not convict him of that crime. Thus, the evidence was sufficient to support Taylor's conviction on the possession charge.

(c) *Criminal gang activity* – Taylor asserts that the evidence was insufficient to support his conviction for participation in criminal gang activity because the State failed to show that he was taking part in any kind of gang activity, that he was associated with two or more persons constituting a gang, that he was associated with a group that engaged in criminal gang activity, or that his participation was intended in any way to further the interests of the Unionville Crips.

However, the Supreme Court has already decided most of these issues against Taylor's arguments when it affirmed Kitchens' conviction for criminal gang activity, because the same gang-related evidence was introduced against both Kitchens and Taylor at trial. *Kitchens*, __ Ga. at __ (1). The Supreme Court's affirmance of

11

Kitchens's conviction on this charge necessarily encompassed findings that gang activity was involved in the incident, that Kitchens was associated with two or more persons engaged in gang activity, that the Unionville Crips were engaged in criminal gang activity, and that the felony murder was committed in furtherance of the interests of that gang.

The only issue remaining then is whether Taylor was associated with the Unionville Crips. We note that the Supreme Court found the evidence showed that Kitchens, Taylor, Watkins, and Johnson were all associated with the Unionville Crips gang. *Kitchens*, __ Ga. at __ (1). Detective Pinson testified that Taylor was associated with the Crips, and Watkins testified that all that was required to associate with the Crips was "to claim it," by "just hanging" in the neighborhood or wearing the gang's color, which was blue. Although we could locate no evidence in the record regarding the color Taylor was wearing that day, the evidence showed that Taylor had "hung" with Watkins and the other Unionville Crips previously. And he was "hanging" with them when he armed himself to travel in a group to the Bloomfield neighborhood that day. Moreover, the jury could have interpreted Taylor's actions that day as his way of claiming affiliation with the Crips. Accordingly, we find that the evidence was sufficient to support Taylor's conviction for participation in criminal gang activity.

12

3. Taylor further contends that the trial court erred in denying his motion to sever at the beginning of trial. The attorneys for Watkins, Johnson, Taylor, and Kitchens all moved to sever their trials shortly before the case was scheduled to begin, and the trial court held a joint hearing on the issue. Taylor's attorney argued at that time that Taylor's defense conflicted with the other defendants who were alleging self-defense, because he was claiming that he was not involved at all. Additionally, he argued he was prejudiced by these antagonistic defenses. Even though Taylor was tried jointly with only Kitchens, he continues to assert that severance was appropriate based on the defenses raised by all the co-defendants below. We find no merit to his arguments.

As the Supreme Court found in Kitchens's appeal,

It is well-settled that a trial court has broad discretion to grant or deny a motion for severance. See OCGA § 17-8-4. In ruling on a severance motion, the trial court should consider: (1) the likelihood of confusion of the evidence and law; (2) the possibility that evidence against one defendant may be considered against the other defendant; and (3) the presence or absence of antagonistic defenses.

(Citations omitted.) *Kitchens*, __ Ga. at __ (3) Moreover, "[t]he burden is on the defendant requesting the severance to do more than raise the possibility that a

13

separate trial would give him a better chance of acquittal. He must make a clear showing that a joint trial would lead to prejudice and a consequent denial of due process." (Citation and punctuation omitted.) Id.

We note that the Supreme Court rejected Kitchens's argument that his trial should have been severed from Taylor's due to their antagonistic defenses. *Kitchens*, __ Ga. at __ (3). The Supreme Court found little likelihood of jury confusion in this case because there were only two defendants at trial and no difference in the law applied to the two defendants. Id. Additionally, as the Court noted, the jury addressed the defendants' indictments separately and returned a separate verdict for each defendant, in which Taylor was acquitted of the murder charges while Kitchens was convicted of felony murder. Moreover, Taylor has failed to demonstrate how his defense was antagonistic to Kitchens,[6] and in any event, antagonistic defenses alone are not sufficient to mandate severance. Id. Based on the Supreme Court's findings and Taylor's arguments, we find that the trial court did not abuse its discretion in denying Taylor's motion to sever.

---

[6] Although Taylor asserts that his defense was that he was not involved in the crimes at all, we note that Taylor argued in support of his inconsistent verdict argument that he also raised a justification defense at trial.

14

4. Taylor raises two enumerations of error regarding his sentencing: (1) that the sentence imposed by the trial court constituted cruel and unusual punishment and (2) that the trial court erred in considering his juvenile record for purposes of sentencing. We find no error.

(a) *Cruel and unusual punishment* – Taylor was sentenced to twenty years in confinement for the aggravated assault on Gary, followed by twenty years for the aggravated assault on Faulks (with five years in confinement and the remainder on probation), followed by an additional fifteen years of probation for the charge of participation in criminal street gang activity and another five years probation for the possession charge, to run consecutively to the other sentences. Each of these sentences was within the statutory range for the crimes of which Taylor was convicted. OCGA §§ 16-5-21; 16-15-4; and 16-11-106.

> If the defendant's sentence falls within the statutory range of punishment set by the legislature, a presumption arises that the sentence does not violate the Eighth Amendment, and the "presumption remains until a defendant sets forth a factual predicate showing that such legislatively authorized punishment was so overly severe or excessive in proportion to the offense as to shock the conscience."

15

(Citation omitted.) *Bray v. State*, __ Ga. App. ___ (3) (Case No. A14A2114, decided Feb. 4, 2015). We find that Taylor has failed to overcome this presumption under the facts of this case, and accordingly, this enumeration is without merit.

(b) *Juvenile Record* – Taylor asserts that the trial court erred in considering his juvenile record, over his objection, for purposes of "enhancing and setting his sentence." In her order denying Taylor's motion for new trial, the trial judge noted that she "considered many factors in setting [Taylor's] sentence, least of which was his juvenile record," and she cited *Burrell v. State*, 258 Ga. 841, 844 (7) (376 SE2d 184) (1989), as support for the proposition that "[t]he Supreme Court of Georgia has long recognized that juvenile records could be considered in the sentencing phase of a capital case." In approving the use of juvenile records in the sentencing phase of that case, the Supreme Court in *Burrell* relied upon the version of former OCGA § 15-11-38 (b) (1981 Code) that was in effect in 1989. That provision expressly allowed the use of juvenile records in dispositional proceedings after a defendant was convicted of a felony. Compare *Miller v. State*, 231 Ga. App. 869, 870 (2) (501 SE2d 42) (1998) (trial court improperly used juvenile dispositions as felony convictions for the purpose of mandatory maximum sentencing pursuant to OCGA § 17-10-7 (c)).

16

In 2000, the legislature reordered, renumbered, and revised certain provisions relating to the juvenile courts. At that point, OCGA § 15-11-38 (b) was re-codified as OCGA § 15-11-79.1,[7] and that statute provided that juvenile court dispositions could be used, inter alia, in "sentencing in felony offenses," and the "records of dispositions and evidence shall be available to district attorneys and superior court judges and the accused and may be used in the same manner as adult records." Ga. L. 2000, p. 91-92, § 1. This statute was in effect at the time of Taylor's sentencing, and thus the trial court properly considered his juvenile court records in sentencing him. See also former OCGA § 17-10-1 (e) ("In any case involving a felony in which the defendant previously appeared before a juvenile court, the records of the dispositions of the defendant as well as any evidence used in any juvenile court hearing shall be available to the district attorney, the defendant, and the superior court judge in determining sentencing as provided in Code Section 15-11-79.1.")

*Judgment affirmed. Phipps, C. J., and Ellington, P. J., concur.*

---

[7] The current version of this provision is codified at OCGA § 15-11-703. Ga. L. 2013, p. 294, § 1-1/HB 242. See also OCGA § 17-10-1 (e), as amended by Ga. L. 2013, p. 294 § 4-17/HB 242.