## S07A0520. TOLBERT v. THE STATE.
### (647 SE2d 555)

HINES, Justice.

John C. Tolbert ("Tolbert") appeals from his convictions for malice murder in connection with the deaths of his estranged wife, Sauda "Candice" Tolbert ("Candice"), and Anthony Walters. For the reasons that follow, we affirm.[1]

Construed to support the verdicts, the evidence showed that Tolbert and the victims were members of the United States Army. At approximately 2:00 a.m. on Sunday, March 31, 2002, Candice and Walters, with whom Candice was romantically involved, were fatally shot inside Walters's mobile home in Hinesville, Georgia. The shots came from outside the trailer; the killer stood on top of a table, which had been placed under a window of the structure, and fired several shots through the window with a nine-millimeter pistol.

The victims were unclothed. Candice was struck by eight bullets, including a fatal shot to the neck, and one to the chest that would also have been fatal in and of itself. Walters was struck by three bullets, a fatal one in the chest, and two in his hands. The victims' wounds were consistent with them being on the couch next to the window from which the shots came, one victim on top of the other, with Candice's right side, and Walters's left side, facing the window. The wounds were also consistent with at least one bullet passing through Walters's hand into Candice's body. Tolbert owned at least one nine-millimeter pistol.

Tolbert had a history of abuse of, and threats toward, Candice. In the month before the shootings, Tolbert declared to a friend that if he caught Candice "doing anything" he would kill her. Candice had

---

[1] The killings occurred on March 31, 2002. On June 10, 2002, a Liberty County grand jury indicted Tolbert for two counts of malice murder and two counts of felony murder while in the commission of aggravated assault. The State filed a notice of intent to seek the death penalty on June 18, 2002. Tolbert was tried before a jury October 4-15, 2004, and found guilty of all charges. On October 15, 2004, by agreement, the trial court sentenced Tolbert to two terms of life in prison without the possibility of parole for the malice murders; the felony murders stood vacated by operation of law. See *Malcolm v. State*, 263 Ga. 369, 372-374 (4), (5) (434 SE2d 479) (1993). Tolbert filed a motion for new trial on November 10, 2004, and amended the motion on September 30, 2005; the motion was denied on November 13, 2006. Tolbert filed his notice of appeal on November 22, 2006; his appeal was docketed in this Court on December 15, 2006, and orally argued on May 14, 2007.

reported to friends that Tolbert had pointed a pistol at her on multiple occasions. Once, Tolbert fired a pistol at her while she was in the bathtub, and in another instance, he "pulled a gun on her and made her go outside" where he forced her to lie on the ground, and he spat on her. Friends spoke with Tolbert about some of these incidents, which he claimed were in the past. Two weeks before the murders, the Tolberts had a physical altercation in which Tolbert pushed Candice away from the telephone when she attempted to contact his military unit.

A week before the murders, when Candice was at Walters's trailer, Tolbert arrived and confronted Walters; during the incident, Tolbert told a friend, "if I catch her, I'm going to kill her ass." Immediately after this incident, Tolbert went to the residence he had shared with Candice to retrieve his belongings, and attempted to lock Candice in the home with him and had a physical altercation with her in which she received scratches on her arms. On at least two other occasions, Tolbert confronted Walters and told him to leave Candice alone. Tolbert stated to a friend that if "he can't have [Candice], nobody was going to have her."

Candice told friends that the couple would divorce. She also told a friend that Tolbert would frequently tell her that he was going to Jacksonville, Florida on weekends, but she would see him or his car when she went out in Hinesville.

While Tolbert was incarcerated awaiting trial, he spoke with Hester, a friend from the Army, who was also incarcerated. Hester asked Tolbert about being charged with the murders and facing potential death sentences, and Tolbert responded by asking Hester what he would have done, and by stating that "he caught his wife cheating and he went out, got his gun and shot them through the window." On a previous occasion, when Hester spoke to Tolbert about his concerns about his own wife's fidelity, Tolbert advised him to "come home early when she wouldn't be expecting me."

Tolbert contended to police that he was in Jacksonville the night of the murders. At trial, he produced several witnesses who testified that he was in that city on the evening of Saturday, March 30, 2002, until approximately 9:00 p.m., and again during the day of March 31, 2002. Tolbert's mother testified that sometime after 9:00 p.m. on March 30, 2002, and before dawn the next day, she saw Tolbert lying on the couch in her Jacksonville home. And two witnesses testified that they saw Tolbert in Jacksonville night clubs between 1:00 and 3:00 a.m. on March 31, 2002.

Testimony showed that the driving time from Jacksonville to the scene of the murders was approximately one hour and forty minutes.

1. Tolbert asserts that the evidence was insufficient to support his convictions. He specifically notes that there was no physical

evidence linking him to the crimes, and that the testimony of Hester should have been discounted. However, the State presented evidence of the prior difficulties between Tolbert and his wife, and it is the jury's role to resolve conflicts in the evidence and the credibility of witnesses. *Watkins v. State*, 273 Ga. 307, 309 (1) (540 SE2d 199) (2001). As to the defense witnesses who testified that they saw Tolbert in Jacksonville between 9:00 p.m. on March 30, 2002, and dawn on March 31, 2002, the State introduced evidence of their prior felony convictions, see *Ely v. State*, 272 Ga. 418, 420 (4) (529 SE2d 886) (2000), citing *Hall v. Hall*, 261 Ga. 188 (402 SE2d 726) (1991), and it was for the jury to resolve conflicts in the evidence and questions of witness credibility. *Sims v. State*, 278 Ga. 587, 589 (1) (604 SE2d 799) (2004). The jury was not required to believe Tolbert's alibi. *Daniels v. State*, 281 Ga. 226, 228 (4) (637 SE2d 403) (2006). The evidence authorized the jury to find Tolbert guilty beyond a reasonable doubt of the malice murders of which he was convicted. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

2. There were two insurance policies on Candice's life which named Tolbert as a beneficiary.[2] In January 2003, the issuer of those policies filed an interpleader action in Federal District Court, seeking to pay into the court's registry the value of the policies and asserting uncertainty as to Tolbert's qualification to receive the proceeds. See OCGA § 33-25-13. The State introduced into evidence certified copies of the complaint in interpleader and Tolbert's answer to it in order to demonstrate his potential monetary benefit from Candice's death.

When the defendant in a murder trial is the beneficiary of an insurance policy on the life of the deceased, "in order to admit evidence of [the] insurance policy there must be some independent evidence of a nexus between the crime charged and the existence of the insurance policy." *Stoudemire v. State*, 261 Ga. 49, 50 (3) (401 SE2d 482) (1991). Tolbert contends that the required nexus was not shown.[3] However, in the trial court, Tolbert did not raise an objection based on the State's failure to show the required nexus between the existence of the life insurance policies and the murders.[4] Accordingly,

---

[2] Tolbert was the sole beneficiary of a $250,000 policy, and the beneficiary of 50% of a $100,000 "spousal coverage" policy; the remaining beneficiaries of that policy were his parents.

[3] In his response to the interpleader action, Tolbert admitted that the policies existed, and admitted that he was a beneficiary of them.

[4] On the opening day of trial, Tolbert objected that copies of the documents had not been produced in discovery, and moved that the documents be excluded; he also moved, apparently in the alternative, for a continuance. The court denied the motions, noted that Tolbert's answer to the civil action indicated that he had notice of it prior to the criminal trial, and allowed Tolbert a continuing objection to the admittance of the civil pleadings. The court also postponed opening statements until the following morning.

appellate review of any error on that ground arising from the admission of this evidence was waived. *Martin v. State*, 281 Ga. 778, 779-780 (2) (642 SE2d 837) (2007).

3. Tolbert urges that he did not receive effective assistance of trial counsel. In order to prevail on this claim, Tolbert must show both that counsel's performance was deficient, and that the deficient performance was prejudicial to his defense. *Smith v. Francis*, 253 Ga. 782, 783 (1) (325 SE2d 362) (1985), citing *Strickland v. Washington*, 466 U. S. 668 (104 SC 2052, 80 LE2d 674) (1984). To meet the first prong of the required test, the defendant must overcome the "strong presumption" that counsel's performance fell within a "wide range of reasonable professional conduct," and that counsel's decisions were "made in the exercise of reasonable professional judgment." Id. The reasonableness of counsel's conduct is examined from counsel's perspective at the time of trial and under the particular circumstances of the case. Id. at 784. To meet the second prong of the test, the defendant must show that there is a reasonable probability that, absent any unprofessional errors on counsel's part, the result of his trial would have been different. Id. at 783. " 'We accept the trial court's factual findings and credibility determinations unless clearly erroneous, but we independently apply the legal principles to the facts.' [Cit.]" *Robinson v. State*, 277 Ga. 75, 76 (586 SE2d 313) (2003).

According to Tolbert, trial counsel should have examined the prospective jurors during voir dire to assess their backgrounds concerning domestic violence. However, counsel testified that not doing so was a tactical decision as his motion to exclude evidence of domestic violence was pending, and if the motion was granted such questions might prejudice the jury. Under the circumstances, counsel's decision was reasonable. See *Corza v. State*, 273 Ga. 164, 169 (4) (b) (539 SE2d 149) (2000). Additionally, Tolbert fails to show any actual prejudice resulting from the failure to ask these questions of the prospective jurors. See *Head v. Carr*, 273 Ga. 613, 622 (4) (c) (2) (544 SE2d 409) (2001).

Tolbert also complains that trial counsel should have called to the witness stand the experts who prepared what he contends are exculpatory laboratory reports. Counsel testified that at trial, he relied upon his cross-examination of the investigating police officers concerning what the physical evidence showed to demonstrate to the jury the lack of physical evidence against Tolbert. Further, at the hearing on the motion for new trial, Tolbert did not call these expert witnesses to testify, and speculation as to what their testimony would have been does not satisfy his burden under *Strickland* to show that the result of his trial would have been different if they had testified. *Cormier v. State*, 277 Ga. 607, 609 (2) (a) (592 SE2d 841) (2004).

Counsel did not ask Tolbert's alibi witnesses any questions on direct examination concerning their prior criminal histories; the State elicited such information during cross-examination. Tolbert contends that it was ineffective for counsel not to question these witnesses on this subject, but he fails to demonstrate that the result of his trial would have been different if the impeaching information had been presented by direct testimony rather than cross-examination.

Tolbert asserts that the State argued that a motive for the killings was to rob Candice of jewelry, and that counsel should have presented witnesses who would have testified that the jewelry found on Tolbert's person had been returned to him by Candice days before the murders. While the State noted in argument that Tolbert had women's jewelry in his possession when arrested, it did not present evidence, or argue, that Tolbert had taken these items from Candice at the time of the murders. Further, the evidence was that the first police officers to respond to the scene of the crimes found the door to Walters's trailer locked with a deadbolt, and there is no reasonable likelihood that the jury believed Tolbert gained possession of the jewelry by robbery.

Finally, Tolbert contends that trial counsel should have interviewed State's witness Hester prior to trial and determined that his discharge from the military was not "honorable," but a "general discharge under honorable conditions." Although Hester testified that he had been honorably discharged from the military, he also testified that when Tolbert told him that he had shot Candice and Walters, Hester was incarcerated for writing bad checks, and there is no reasonable likelihood that the result of Tolbert's trial would have been different if the jury had been informed that Hester's military discharge was less than "honorable." See *Murrell v. Ricks*, 280 Ga. 427 (627 SE2d 546) (2006); *Bales v. State*, 277 Ga. 713, 715 (2) (594 SE2d 644) (2004).

*Judgments affirmed. All the Justices concur.*

DECIDED JUNE 29, 2007.

*Barbara N. Lanier*, for appellant.

*Tom Durden, District Attorney, Mark A. Hendrix, Assistant District Attorney, Thurbert E. Baker, Attorney General, David A. Zisook, Assistant Attorney General*, for appellee.