In the Supreme Court of Georgia

Decided:   October 6, 2014

S14A0997. HOOKS v. THE STATE.

BLACKWELL, Justice.

Alton Hooks was tried by a Fulton County jury and convicted of the murder of Diane Gibbs, the murder of Jimmy Gibbs, and the unlawful possession of a knife during the commission of a felony. Hooks appeals, contending that the evidence is legally insufficient to sustain his convictions, that the trial court erred when it denied his motion for a mistrial, and that it erred when it admitted certain evidence. Upon our review of the record and briefs, we see no error, and we affirm.[1]

---

[1] Diane and Jimmy Gibbs were killed in December 1999. Hooks was indicted on April 7, 2000, and he was charged with two counts of malice murder, two counts of felony murder, two counts of aggravated assault with a deadly weapon, and one count of unlawful possession of a knife during the commission of a felony. His trial commenced on May 13, 2002, and the jury returned its verdict four days later, finding Hooks guilty on all counts. Although the trial court merged the aggravated assaults into the murders, it erroneously sentenced Hooks to *four* consecutive terms of imprisonment for life for both of the malice murders *and* both of the felony murders. See Malcolm v. State, 263 Ga. 369, 371 (4) (434 SE2d 479) (1993) ("When the elements of malice and an underlying felony both exist in a murder case, the law does not preclude verdicts of guilty of both malice and felony murder. However, where there is a single victim, the defendant may be sentenced on either but not

1. Viewed in the light most favorable to the verdict, the evidence shows that Diane lived with her son Jimmy in Overlook Atlanta, an apartment complex in west Atlanta. For awhile, Diane was in a romantic relationship with Hooks. By December 1999, however, the relationship had soured, and around that time, Hooks told a relative that Diane was "going to make [him] do something to her." On December 15, a neighbor saw Hooks in the apartment that Diane and Jimmy

both." (Citation omitted)). The trial court also sentenced Hooks to a consecutive term of imprisonment for five years for the unlawful possession of a knife. After Hooks timely filed a motion for new trial, the State offered to consent to the court vacating the sentences for murder and resentencing Hooks for only two counts of murder, so long as Hooks agreed to withdraw his motion and waive any appeal. Hooks agreed, he withdrew his motion for new trial, and on October 23, 2003 the trial court vacated the sentences for murder and resentenced Hooks for murder to *two* consecutive terms of imprisonment for life with the possibility of parole. Notwithstanding his agreement, Hooks eventually sought to file an appeal, and in Hooks v. State, 284 Ga. 531 (668 SE2d 718) (2008) (Hooks I), this Court held that Hooks had not actually waived his right of appellate review, in part because his original sentences for murder were void, and "the [re]sentencing agreement did not have any genuine value to Hooks." 284 Ga. at 533-536 (2). Following our decision in Hooks I, the trial court permitted Hooks to file another motion for new trial, and Hooks filed such a motion in April 29, 2011. The trial court denied his motion on June 20, 2012, and Hooks timely filed a notice of appeal on June 29, 2012. The case was docketed in this Court for the April 2014 term and submitted for decision on the briefs.

Hooks complains in his brief about an apparent error in the June 20, 2012 order (denying his second motion for new trial), which referred to Hooks as being under two sentences of life imprisonment *without* the possibility of parole. But Hooks clearly was resentenced in 2003 to two terms of life imprisonment *with* the possibility of parole (plus five additional years to run consecutively to the life sentences for unlawful possession of a knife during the commission of a felony), and he has not been resentenced since 2003. The June 20, 2012 order did not purport to resentence Hooks yet again, and he remains under the sentences imposed at his 2003 resentencing.

shared, noting that Hooks stood by the front door "[p]ractically the whole day," which the neighbor thought was unusual.

Two days later, relatives of Diane and Jimmy went to the apartment, concerned that they had not heard from Diane or Jimmy. When no one answered the door, the relatives summoned a security guard, who, in turn, called for police officers. The responding officers found no evidence of a forced entry into the apartment. They entered the apartment, however, and found a trail of blood, which they followed to a bedroom. In the bedroom closets, the officers discovered Diane and Jimmy's bodies. Both had sustained stab wounds to their necks, and Jimmy had sustained a number of defensive wounds as well. The evidence showed that Diane had been stabbed in a bed in that same bedroom, and she then had been dragged to one of the closets. Jimmy evidently had been stabbed in another room, and he then had been dragged to a second closet in the bedroom in which Diane was stabbed. Although the type of knife used to inflict the neck wounds could not be identified definitively, at least some of the defensive wounds that Jimmy sustained were shown to have been inflicted with a serrated knife.

In addition, investigators found blood in a bathroom of the apartment — both on a sink and a shower curtain — which was consistent with someone recently having tried to wash blood from his body. Investigators also found a note in the apartment, which read: "I[,] Alton[,] just killed Diane and myself. Please send help[.]" A handwriting expert later compared this note to a known sample of Hooks's handwriting and concluded that Hooks wrote the note.

Also on December 17, an employee of a motel just outside Atlanta observed blood on the window of a room in which Hooks was staying, and the same employee saw Hooks lying on the bed, his hand in a Styrofoam container. The employee called for police officers, and when officers responded, they found Hooks barricaded in his room, armed with a serrated knife. The officers said nothing to Hooks about Diane and Jimmy, but Hooks repeatedly asked them "what he was going to be charged with," and he cut himself with the knife several times. After a twelve-hour standoff, a SWAT team entered the room by force, officers apprehended Hooks, and they took him to a hospital, where he was arrested for the murders of Diane and Jimmy.

At trial, evidence of an earlier incident involving Hooks and his ex-wife was admitted as a similar transaction. In that incident, Hooks — armed with a

4

box cutter — had entered the home of his ex-wife and cut her neck as she slept in her bed.[2] A police officer testified that Hooks left a note in the home of his ex-wife, in which he said that he had cut her and intended to kill himself.

Hooks contends that the evidence is legally insufficient to prove beyond a reasonable doubt that he is guilty of the crimes of which he was convicted. In support of this contention, Hooks points to the lack of any eyewitness to the murders, the limited physical evidence, and the fact that he had an alibi on December 16, 1999, which, he says, was the date that the medical examiner concluded that the murders occurred. But Hooks is mistaken in his assertion that the medical examiner testified conclusively that the murders occurred on December 16. To the contrary, the medical examiner testified that the murders could have occurred on December 15 or 16. Moreover, even if the jury believed the testimony about Hooks's alibi, that testimony did not give Hooks an alibi for the entire day of December 16. And to the extent that there were conflicts in the evidence, it was for the jury as the finder of fact "to resolve [those] conflicts." Tolbert v. State, 282 Ga. 254, 256 (1) (647 SE2d 555) (2007) (citation omitted).

---

[2] His ex-wife survived this incident and testified in his trial for the killings of Diane and Jimmy.

In all, the evidence adduced at trial — including the threatening statement made by Hooks about Diane prior to the murders, his suspicious behavior in the apartment that Diane and Jimmy shared around the time of the murders, his confession in a note left in the apartment, his conduct in the motel (including his repeated questioning of police officers about what charges he would be facing), and his almost identical assault upon his ex-wife — was legally sufficient to authorize a rational trier of fact to find beyond a reasonable doubt that Hooks was guilty of two counts of malice murder and one count of unlawful possession of a knife during the commission of a felony. See Jackson v. Virginia, 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979).

2. Hooks claims that the trial court erred when it denied his motion for a mistrial after a police officer, he says, commented upon his invocation of his right to remain silent. The comment about which Hooks complains was made as the officer was testifying about having met Hooks in the hospital after he was removed from his motel room. In response to a question about "when, if ever," the officer placed Hooks under arrest, the officer replied, "I read him his rights immediately. He indicated that he was in too much pain —". Hooks promptly objected to this testimony, claiming that it was an impermissible comment upon

his invocation of his right to remain silent, and Hooks moved for a mistrial. See Reynolds v. State, 285 Ga. 70, 71 (673 SE2d 854) (2009). The trial court denied his motion.

Whether to declare a mistrial is a matter committed to the sound discretion of the trial court. McKibbins v. State, 293 Ga. 843, 848 (3) (750 SE2d 314) (2013). Here, even to the extent that a juror might have surmised that the police officer intended to say that Hooks was in too much pain "to speak" or "to provide a statement," such testimony would indicate only that Hooks did not speak to the officer at that time because he was in too much pain to do so, not because he was invoking his right to remain silent. And in any event, the trial court instructed the jury that it could not consider any invocation of such a constitutional right in reaching its verdict. See Fletcher v. State, 284 Ga. 653, 656 (4) (670 SE2d 411) (2008). In this case, we conclude that the trial court acted within its discretion when it determined that a mistrial based on the police officer's incomplete response to the question about Hooks's arrest was not "essential to preserve [Hooks's] right to a fair trial." McKibbins, 293 Ga. at 849 (3) (citation and punctuation omitted).

3. Hooks also contends that the trial court erred when it allowed a police officer to testify about the contents of the note that Hooks left when he attacked his ex-wife.[3] The trial court permitted the officer to testify that Hooks "admitt[ed] [in the note] that he had cut her and intended to kill himself." But the State did not produce the note itself, and Hooks contends that the State failed to present competent evidence that the note had been destroyed. Consequently, the testimony about the contents of the note, Hooks argues, violated the best evidence rule.

Under our former Evidence Code, the old best evidence rule provided that "[t]he best evidence which exists of a writing sought to be proved shall be produced, unless its absence shall be satisfactorily accounted for[,]" that "[i]f a paper shall have been lost or destroyed, proof of the fact to the court shall admit secondary evidence[,]" and that whether a diligent search has been made for the

---

[3] In addition, Hooks claims that no evidence of his assault upon his ex-wife should have been admitted because that assault was *too* similar to the murders of Diane and Jimmy, making it impossible, Hooks says, for the jury to render a fair and impartial verdict in this case. But Hooks has waived this claim because he did not raise it in the trial court. See Hartman v. State, 266 Ga. 613, 614 (2) (469 SE2d 163) (1996). Even if the claim were not waived, it is meritless. The trial court gave a limiting instruction to ensure that the jury considered the similar transaction evidence for a proper purpose. And a similar transaction is *required* to be similar to the charged offense in order to be admitted under the rule for similar transaction evidence. Williams v. State, 261 Ga. 640 (409 SE2d 649) (1991).

lost evidence is a question "for the sound discretion of the [trial] court." Former OCGA §§ 24-5-4 (a) and 24-5-21.[4] Here, the State accounted for the absence of the note, informing the trial court that one of the prosecuting attorneys in this case had diligently sought to obtain the note from the prosecuting attorney of the county in which the similar transaction had occurred, but she was unable to procure the note because it had been destroyed during the 13 years since the similar transaction occurred. Because the State explained why it was unable to produce the note, it was within the trial court's discretion to allow the police officer to testify about his recollection of what the note said. See Johnson v. State, 209 Ga. App. 395, 396 (2) (433 SE2d 638) (1993).

Judgment affirmed. All the Justices concur.

---

[4] Hooks was tried before January 1, 2013, the effective date of the new Evidence Code. The former best evidence rule was superseded in the new Evidence Code by the provisions of OCGA § 24-10-1001 et seq.