In the Supreme Court of Georgia

Decided:    November 24, 2014

S14A0602. WRIGHT v. THE STATE.

HINES, Presiding Justice.

Jeffery Wright appeals from his convictions and sentences for the malice murder of Ricardo Carbajal, the aggravated assaults of Carbajal, Eduardo Torrijos,  Librado Gonzalez, and Victor De Leon Vega, the false imprisonment and armed robbery of Andre Lard, and possession of a firearm during the commission of a crime.  For the reasons that follow, we affirm.[1]

---

[1]The crimes were committed on June 16 and 20, 2008.  Wright was originally indicted in 2008. On April 22, 2010, a Cobb County grand jury returned a superceding indictment charging him with the malice murder of Carbajal, two counts of the felony murder of Carbajal while in the commission of aggravated assault, two counts of aggravated assault against Carbajal, two counts of aggravated assault against Eduardo Torrijos, two counts of aggravated assault against Librado Gonzalez, two counts of aggravated assault against Victor De Leon Vega, the false imprisonment of Lard, the armed robbery of Lard, and two counts of possession of a firearm during the commission of a crime.  Wright was tried before a jury April 26-30, 2010, and found guilty on all counts.  On May 10, 2010, Wright was sentenced to life in prison for malice murder, four concurrent terms of 20 years in prison for a count of aggravated assault as to each aggravated assault victim, and consecutive terms of ten years in prison for false imprisonment, twenty years for armed robbery, and two separate terms of five years in prison for possession of a firearm during the commission of a crime; the remaining charges either merged with a crime for which a sentence was entered or were vacated by operation of law.  See *Malcolm v. State*, 263 Ga. 369, 371-374 (4) (5) (434 SE2d 479) (1993).  Wright filed a motion for new trial on May 20, 2010, which he amended on June 3, 2010, on March 6, 2013, and again on March 20, 2013.  On August 1, 2013, the motion, as amended, was denied. Wright filed a notice of appeal on August 13, 2013, and the appeal was docketed in this

Construed to support the verdicts, the evidence showed that on June 16, 2008, Wright, along with Zachary Brown and Nathan Stokes, approached Lard while in Wright's Crown Victoria automobile; Brown exited the vehicle and, at gunpoint, forced Lard into Wright's car and took from him some marijuana, his wallet, cell phone, shirt, and pants. After releasing Lard, Brown fired a shot, and Wright drove the car away. A .40 caliber spent cartridge casing was found at the scene.

On June 20, 2008, Wright placed a pistol in the rear passenger compartment of his Crown Victoria, while Brown was present. Later that day, Wright drove Brown and Stokes to the Sedona Falls apartment complex; they were "looking for some money" and intended to rob someone for it. Brown saw four Hispanic men seated on the ground and told Wright to stop, Wright did so, and Brown and Stokes exited the car; Brown carried a .40 caliber pistol. While Wright turned the car around, Brown and Stokes approached the Hispanic men and Stokes demanded their money while Brown pointed his pistol at them. The four Hispanic men rose from the ground, and put their hands in the air. At this time, a car carrying Christopher Mora and his family arrived; they were

Court for the April 2014 term and orally argued on April 7, 2014.

residents of the apartment complex and knew Carbajal. Mora told the driver, his wife, to stop; he exited the car and asked what was going on. Brown pointed the pistol at Mora, who retreated to his car; two of the intended robbery victims fled, and Carbajal raised his hand, at which point Brown fired two shots at him, one of which fatally struck him in the chest from close range.

Wright shouted to Brown just before Brown shot Carbajal.[2] After the shooting, Wright gestured to Brown and Stokes to get in the car, which they did. Brown continued to point the pistol at the victims as he went to the waiting car, and then pointed it at them out the car's window. Wright drove the Crown Victoria away. Mora found George Turner, an armed, uniformed security guard for the apartment complex, and told him of the shooting. In their separate vehicles, Turner and Mora followed Wright's car outside the apartment complex, while Turner called 911; through the open windows of the cars, Mora indicated to Turner that Wright's car was the one involved in the shooting, and Mora then ceased to follow Wright's car. Wright expressed to his companions the belief that they were being followed; he turned the Crown Victoria into the

---

[2] Victim Gonzalez did not know what was shouted, as he did not understand English. Brown maintained that he heard someone shout "duck," he did so, and thus avoided a bottle Carbajal threw at him.

parking lot of another apartment complex, and stopped. Turner followed and stopped his vehicle, exited it, drew his pistol, and told the men in the Crown Victoria to put their hands up; the driver and front seat passenger looked at him, and the driver put the car in reverse, backed out of the space, and exited the parking area. The Crown Victoria was stopped by law enforcement officers a short time later, and the three men were arrested. A .40 caliber pistol was found under the front passenger's seat; it proved to have ejected the .40 caliber spent cartridge casing found at the scene of the Lard robbery, as well as two .40 caliber spent cartridge casings found at the scene of the Carbajal shooting.

On June 21, 2008, Brown gave law enforcement officers a custodial statement concerning the Carbajal shooting.[3] He said that: on June 20, 2008, Wright showed Brown a handgun; Wright permitted Brown to hold it, then placed it in the rear passenger compartment of his Crown Victoria; Wright drove Brown and Stokes to the Sedona Falls apartment complex as the three men were "looking for some money"; the three men planned to rob someone; they saw some Hispanic men; Wright stopped the car and Brown, carrying the handgun,

_____

[3] At the time of the statement, investigators did not yet know of the connection to the Lard robbery.

exited the car, as did Stokes; they approached the Hispanic men; Brown showed them the handgun and Stokes demanded money; another car pulled up, a man got out and asked what was going on; distracted, Brown heard someone yell "duck" and saw a bottle that had been thrown toward him; Brown ducked and fired two gunshots in the direction that the bottle had come from; by then, Wright had pulled the car up near Brown and Stokes; and, Brown and Stokes entered the car, which was driven away.

During the hearing at which he pled guilty to the malice murder of Carbajal and the armed robbery of Lard, Brown testified to similar facts. However, at trial, he testified that Wright did not have any foreknowledge of his plans to rob Lard or the Hispanic men, and at the Sedona Falls apartment complex, he exited the car with Stokes to meet an unidentified "somebody," and that after exiting the vehicle, he independently formulated his plan to rob the Hispanic men. Shortly after his arrest, Wright telephoned Brown's girlfriend and asked her to contact Brown and request that he provide an affidavit stating that Wright knew nothing of the crimes.

1. The State presented evidence of a 2004 incident in which, in a residential neighborhood, Wright, along with two other men, was seated on a

roadside curb when Trevor Norris was walking toward his home; one of the men wore a paint ball mask. Wright and his companions began to run after Norris, who was able to enter his home and shut and lock the door behind him. However, Wright had also managed to enter the home, and began to struggle with Norris, repeatedly demanding, "where's the money"; Norris sold marijuana out of his home and had previously sold it to one of Wright's companions, who also was aware that Norris had recently sold a "four-wheeler." Norris was able to exit his house through a backdoor and called 911 from a neighbor's home; he did not wish to prosecute his attackers because of his marijuana activities and fear of reprisal.

Under the law effective at the time of Wright's trial, to introduce evidence of a similar transaction, the State was required to show that:

> (1) it seeks to introduce the evidence not to raise an improper inference as to the accused's character, but for some appropriate purpose which has been deemed to be an exception to the general rule of inadmissibility; (2) there is sufficient evidence to establish that the accused committed the independent offense or act; and (3) there is a sufficient connection or similarity between the independent offense or act and the crime charged so that proof of the former tends to prove the latter.

*Brown v. State*, ___ Ga. ___, (8) (___ SE2d ___) (2014) (Case nos. S14A0800

6

& S14A0801, decided October 6, 2014) (Citation and punctuation omitted.) Citing OCGA § 24-4-404 (b),[4] Wright asserts that the trial court admitted the evidence for at least one inappropriate purpose; however, "[a]t the time of [his] trial, it was appropriate for the State to introduce evidence of a defendant's prior bad acts for the purpose of showing his 'course of conduct' and 'bent of mind.' [Cit.]" *Brown*, supra. Wright also points to differences between the Norris attack and the crimes charged, but "[t]he proper focus is on the similarities, not the differences, between the crimes charged and the prior acts. [Cit.]" Id. In each instance, Wright, with two accomplices, in a residential area, approached a victim or victims with the intent to commit a robbery using physical force or a weapon. All of the chosen victims could be considered reluctant to pursue

---

[4] OCGA § 24-4-404 (b), effective January 1, 2013, reads:

Evidence of other crimes, wrongs, or acts shall not be admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, including, but not limited to, proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. The prosecution in a criminal proceeding shall provide reasonable notice to the defense in advance of trial, unless pretrial notice is excused by the court upon good cause shown, of the general nature of any such evidence it intends to introduce at trial. Notice shall not be required when the evidence of prior crimes, wrongs, or acts is offered to prove the circumstances immediately surrounding the charged crime, motive, or prior difficulties between the accused and the alleged victim.

criminal prosecution of their attackers: in both the Norris attack and the Lard attack, the victim was believed by at least one of the attackers to sell marijuana; all the victims and witnesses at the Carbajal shooting were Hispanic, and testimony established that members of that community, particularly in the area in which Carbajal was killed, were frequently reluctant to report to law enforcement authorities when they were victims of crimes, or witnesses to such.[5] The trial court did not abuse its discretion in concluding that the incidents were sufficiently similar and in admitting the evidence of the 2004 transaction. Id.

2. The State intended to call Stokes to testify during Wright's trial. He had previously pled guilty to the felony murder of Carbajal and the armed robbery of Lard. Prior to Wright's trial, Stokes moved to withdraw his guilty pleas. Outside the presence of the jury, Stokes testified that while he pled guilty to the crimes, he was "forced into" doing so, and did not intend to testify against Wright. Stokes consulted with his attorney, who informed the court that Stokes would refuse to testify.

The court, the prosecutor, and Wright's counsel discussed the possibility that Stokes would be ordered to testify, and the potential use of the transcript of

---

[5] Evidence was introduced that the men with Carbajal were in the United States illegally.

his plea hearing. Defense counsel queried whether it might be considered a prior inconsistent statement, "or is it a necessity exception, or - - I'm not [sure] how it would come in." The court replied that it might be used for impeachment or to refresh Stokes's recollection, and noted that the State could "hand him a copy of his transcript and say, Does that refresh your recollection, and then go on from there in terms of that. So I don't know, based on what we know right now, for what purpose it might be used, and probably the State doesn't know for sure either." The court invited counsel to address the court outside the jury's presence regarding the use of the plea transcript, in the event it became necessary.

Wright's counsel added: "I guess to fully flesh out my point, my only concern is, my right to - - the confrontation right with respect to that statement." The court responded that it would monitor the situation, "so that you can have a meaningful cross-examination of the witness and so forth," to which defense counsel replied, "Okay."

After further discussion, the court informed Stokes that, given his prior guilty pleas, he had no privilege against self-incrimination, and ordered Stokes to testify. When the jury was again in the courtroom, Stokes was called to

testify; he said that although he entered guilty pleas to charges regarding involvement in the murder of Carbajal and the robbery of Lard, in fact, he had no involvement in those crimes, but that he was "forced" into entering "coerced" pleas. He admitted that he was in a car driven by Wright on June 20, 2008, but denied that he went to the apartment complex where Carbajal was killed. He also denied having gone with Wright and Brown to the area where Lard was robbed four days earlier. During his plea hearing, however, Stokes had testified: "We went over there to get some money; not sure what, but it was briefly known, and we were going to go rob Mr. Ricardo [Carbajal] and his friend. I'm sorry that he died that night, but the robbery went south and he got killed." When Stokes was on the witness stand during Wright's trial, he was asked whether he had so testified at the plea hearing and replied that he could not recall. He was then asked to read this portion of the plea transcript to see if it refreshed his recollection, and he testified that it did not. He also testified that at the time of his pleas, he did not know what the evidence in the case was.

The jury was excused for a lunch break, and the State moved to have the transcript of the plea hearing read to the jury as a prior inconsistent statement

under former OCGA § 24-9-83,[6] arguing that Stokes's version of events testified to at the plea hearing was different from that given at Wright's trial, and thus, inconsistent. The State argued "in addition" that, as Stokes had testified that his pleas were coerced and that when he entered them he did not know the facts that could be put into evidence against him, the entire transcript should be read to impeach that portion of Stokes's trial testimony. Wright's counsel responded that the portion of the plea hearing dealing with Stokes's *Boykin*[7] rights could be redacted, and perhaps other portions, but that he did not "think everything comes in." The court then proposed that, during the lunch break, defense counsel examine the transcript of the plea hearing to determine what might need to be redacted, discussing the matter with the prosecutor as needed.[8]

---

[6] Former OCGA § 24-9-83, effective at the time of Wright's trial, read:

A witness may be impeached by contradictory statements previously made by him as to matters relevant to his testimony and to the case. Before contradictory statements may be proved against him, unless they are written statements made under oath in connection with some judicial proceedings, the time, place, person, and circumstances attending the former statements shall be called to his mind with as much certainty as possible. If the contradictory statements are in writing and in existence, they shall be shown to him or read in his hearing. To lay this foundation, the witness may be recalled at any time. When thus impeached, the witness may be sustained by proof of general good character, the effect of the evidence to be determined by the jury.

[7] See *Boykin v. Alabama*, 395 U.S. 238 (89 SCt 1709, 23 LE2d 274) (1969).

[8] The transcript of Stokes's plea hearing consists of a total of 25 pages.

11

After the lunch recess, defense counsel stated that he had taken the opportunity to examine the transcript, raised matters pertaining to Stokes's in-court address to Carbajal's widow, and questioned whether some of Stokes's hearing testimony was, in fact, inconsistent with his trial testimony. The court ruled that Stokes's apology to the victim's widow was inconsistent with his trial testimony that he was not involved in the killing, and that "in order for the jury to understand what [Stokes] said, you would have to read this statement, essentially, in its entirety." The court also stated, however, that if defense counsel would point to "specific lines . . . that should be stricken, I would consider those as well," and the State made certain suggestions regarding redaction, most of which were agreed to by defense counsel. Defense counsel then moved to redact the State's recitation of the factual basis for the pleas, see *State v. Evans*, 265 Ga. 332, 333-334 (1) (454 SE2d 468) (1995); Uniform Superior Court Rule 33.9, on the theory that, essentially, the prosecutor would be testifying "[a]nd I don't think that would be appropriate. We are not allowed, obviously, to testify at trial." The State responded that the State's recitation of the factual basis would impeach Stokes's trial testimony that he "did not know the facts of what he was pleading to." Defense counsel further argued that the

procedure would place before the jury "the State's version of the case [but] that's the whole point of us having a trial," and that if the factual basis were presented as a "version of facts" to which Stokes agreed, "now, it's not a *Bruton*[9] problem, but it's certainly going to impact my client no matter what limiting instruction you're going to give." The court responded that it would not "say anything about whether [Stokes] did or did not agree with" the State's recitation of the factual basis for the pleas.

Wright asserts that Stokes's testimony during the plea hearing should not have been admitted at his trial as Stokes never denied having made the statements recorded in the plea hearing transcript. Under former OCGA § 24–9–83, however,

> the fact that the witness admits that he or she made the inconsistent pre-trial statement does not render it inadmissible. We have rejected the assertion that a prior inconsistent statement is admissible only if the witness denies making the prior statement, but not if he simply disputes the truth of the earlier statement. There is no such 'denial' requirement under [former OCGA § 24–9–83.]

*Johnson v. State*, 289 Ga. 106, 108 (3) (709 SE2d 768) (2011) (Citations and punctuation omitted.)

---

[9] See *Bruton v. United States*, 391 U.S. 123 (88 SCt 1620, 20 LE2d 476) (1968).

13

Wright further argues that the State's recitation of the factual basis for the pleas, and the portions of the plea transcript addressing Stokes's attorney's representation of him at the hearing, were not prior inconsistent statements made by Stokes, and thus, not admissible under former OCGA § 24-9-83. However this argument ignores that at trial the State asserted that these portions of the plea hearing transcript contradicted Stokes's trial testimony that he did not know the facts underlying the charges against him when he entered his guilty pleas, and that his pleas were coerced. As such, the evidence was admissible not under former OCGA § 24-9-83, but under former OCGA § 24-9-82.[10] See *Wilkins v. State*, 291 Ga. 483, 488-489 (9) (731 SE2d 346) (2012). Although the trial court apparently relied upon former OCGA § 24-9-83 in admitting the evidence, this Court "will affirm a trial court's ruling if it is right for any reason. [Cit.]" *Mathis v. State*, 279 Ga. 100, 102 (3) (a) (610 SE2d 62) (2005).[11] To the extent that Wright asserts that he was deprived of his right to confront the witnesses against him, as he could not question the prosecutor who stated the factual basis

[10] Former OCGA § 24-9-82, effective at the time of Wright's trial, read in toto: "A witness may be impeached by disproving the facts testified to by him."

[11] In its final charges to the jury, the trial court instructed that a witness could be impeached in the manner specified in former OCGA § 24-9-82.

for Stokes's pleas, Stokes's plea counsel, or the judge who presided over the plea hearing, the issue was not preserved for appellate review. See *Hall v. State*, 292 Ga. 701, 702 (2) (743 SE2d 6) (2013) ( "'In order to raise on appeal an impropriety regarding the admissibility of evidence, the specific ground of objection must be made at the time the evidence is offered, and the failure to do so amounts to a waiver of that specific ground.' (Citation and punctuation omitted.) [Cit.]") Wright's only mention of a potential Confrontation Clause issue pertained to his ability to question *Stokes*, when it was unknown whether Stokes would testify at Wright's trial and be subject to cross-examination, see *Livingston v. State*, 268 Ga. 205, 211 (4) (486 SE2d 845) (1997); his objection to the prosecutor's factual basis being read to the jury was on a different ground.

3. Wright contends that the evidence against him was insufficient to prove beyond a reasonable doubt that he was guilty of the crimes of which he was convicted. See *Jackson v. Virginia*, 443 U.S. 307 (99 SCt 2781, 61 LE2d 560) (1979). He notes that he was not specifically identified by any victim,[12] but

---

[12] At trial, Lard said he did not recognize Wright as the driver, testifying that "if they never would have killed [Carbajal], the only dude I be looking for is the [one who wielded the handgun.]" He admitted that he had told prosecutors he did not want to testify, but denied the reason was that he was "afraid of being a snitch," saying instead that "[i]t's about morals and principles." Prior to trial, Lard told his mother and investigating officers that he recognized all three men from television pictures shown after their arrest for Carbajal's murder.

the jury was instructed on the law of parties to a crime.

> A party to a crime is one who intentionally aids or abets the commission of the crime, or intentionally advises, encourages, hires, counsels, or procures another to commit the crime. OCGA § 16-2-20 (b) (3) & (4). "Whether a person is a party to a crime may be inferred from that person's presence, companionship, and conduct before, during, and after the crime." (Citation and punctuation omitted.) [Cit.]

*Conway v. State*, 281 Ga. 685, 687 (1) (642 SE2d 673) (2007). Wright argues that the in-court testimony of Brown should be credited, and that the impeaching testimony from his plea hearing and his custodial statement should have been rejected, and the jury should have thus accepted that Wright did not know of, or participate in, the plan to rob Carbajal, which resulted in his death. However, this ignores the eyewitness evidence that the driver of the Crown Victoria, Wright, shouted to Brown before Brown shot Carbajal, then gestured to Brown and Stokes to get into the car, which Wright then drove away, and Wright's behavior as the driver of the "getaway" vehicle after both Carbajal's shooting and the robbery of Lard.

"When this Court reviews the sufficiency of the evidence, it does not re-weigh the evidence or resolve conflicts in witness testimony, but instead it defers to the jury's assessment of the weight and credibility of the evidence.

16

[Cit.]" *Greeson v. State*, 287 Ga. 764, 765 (700 SE2d 344) (2010). It is for the jury to resolve conflicts in the evidence and questions of witness credibility, not this Court. *Tolbert v. State*, 282 Ga. 254, 256 (1) (647 SE2d 555) (2007). The evidence authorized the jury to find Wright guilty beyond a reasonable doubt of the crimes of which he was convicted. *Jackson*, supra.

4. Finally, Wright contends that his trial counsel failed to provide effective representation in several respects. In order to prevail on a claim of ineffective assistance of counsel, Wright must show both that counsel's performance was deficient, and that the deficient performance was prejudicial to his defense. *Smith v. Francis*, 253 Ga. 782, 783 (1) (325 SE2d 362) (1985), citing *Strickland v. Washington*, 466 U.S. 668 (104 SCt 2052, 80 LE2d 674) (1984). To meet the first prong of the required test, he must overcome the "strong presumption" that counsel's performance fell within a "wide range of reasonable professional conduct," and that counsel's decisions were "made in the exercise of reasonable professional judgment." Id. The reasonableness of counsel's conduct is examined from counsel's perspective at the time of trial and under the particular circumstances of the case. Id. at 784. To meet the second prong of the test, he must show that there is a reasonable probability that, absent

17

any unprofessional errors on counsel's part, the result of his trial would have been different. Id. at 783. "'We accept the trial court's factual findings and credibility determinations unless clearly erroneous, but we independently apply the legal principles to the facts.' [Cit.]" *Robinson v. State*, 277 Ga. 75, 76 (586 SE2d 313) (2003).

At the hearing on his motion for new trial, Wright did not call his trial attorney as a witness. "When trial counsel does not testify at the hearing on the motion for new trial, it is extremely difficult to overcome the strong presumption that counsel's performance was reasonable. [Cit.]" *White v. State*, 281 Ga. 276, 281(6) (637 SE2d 645) (2006). Further, as to trial counsel's failure to call at trial witnesses to contradict the testimony of the victim of the 2004 similar transaction, Wright cannot show prejudice resulting from this performance; the witnesses he claims counsel should have called did not testify during the hearing on the motion for new trial, and Wright failed to establish what trial testimony they would have given that would have aided his defense. See *Reaves v. State*, 292 Ga. 545, 550 (4) (739 SE2d 368) (2013). Wright also complains that trial counsel did not introduce evidence of his "diminished mental capacity, and special education records from school," but again, no such

evidence was introduced at the hearing on the motion for new trial, and he fails to show prejudice.  Id.  To the extent that Wright presented testimony at the hearing that he could be taken advantage of by friends, the trial court did not err in determining that Wright failed to show prejudice resulting from trial counsel's failure to present such.  *Smith*, supra.

Judgments affirmed.  All the Justices concur.