301 Ga. 712
FINAL COPY

S17A0783. WILLIAMS v. THE STATE.

PETERSON, Justice.

Joseph Scott Williams was convicted of malice murder and other crimes

in connection with the shooting death of Adiren Thompson.[1] Williams appeals

and argues that the trial court erred in: (1) denying his motion to shuffle the jury

pool; (2) excluding evidence supporting his claim of self-defense; (3) denying

his motion for a mistrial when the State questioned him about allegations of jury

---

[1] The crimes occurred in June 2013, and Williams was indicted for malice murder (Count 1), two counts of aggravated assault (Counts 2 and 3), felony murder (Count 4), two counts of possession of a firearm during the commission of a crime (Counts 5 and 6), possession of a firearm by a convicted felon (Count 7), five counts of cruelty to children in the third degree (Counts 8 through 12), and two counts of terroristic threats (Counts 13 and 14). Prior to trial, the State nolle prossed Count 7. At Williams's July 2014 trial, the trial court granted a directed verdict of acquittal on Counts 8, 9, and 11; the jury acquitted Williams of Counts 10, 12, and 14 and found him guilty of Counts 1 through 6 and Count 13. The trial court sentenced Williams to life in prison without parole for Count 1 (malice murder), a concurrent five- year term for Count 13, and five years probation for Count 5 to be served consecutively to Count 13. The felony murder count was vacated by operation of law, and the court merged the aggravated assault counts (Counts 2 and 3) with Count 1. On July 24, 2014, Williams filed a timely motion for new trial, which he subsequently amended, and the trial court denied the motion on December 23, 2015. Williams filed a timely notice of appeal, and the case was docketed to this Court for the term beginning in April 2017 and submitted for a decision on the briefs.

tampering by a third party; and (4) failing to charge the jury on involuntary manslaughter. Williams also argues that (5) his trial counsel was ineffective. We affirm because the court was not required to shuffle the jury pool, any error in excluding the evidence in support of Williams's self-defense claim was harmless, the court's instruction to the jury cured the prejudicial effect of any improper questioning, the evidence did not support a jury charge on involuntary manslaughter, and Williams has failed to show that trial counsel was ineffective.

Viewed in the light most favorable to the verdict, the trial evidence showed the following. Williams and Thompson were friends until Williams went to prison and Thompson started dating Williams's wife Chassity. Chassity divorced Williams in early 2010 while he was still incarcerated. When Williams was released from prison later that year, he showed considerable animosity toward Chassity and Thompson. In April 2010, he visited Chassity's home to retrieve some personal belongings, told her that she "wasn't going to be with" Thompson, and destroyed her cell phone. Williams at some point told Chassity that he did not want to see Thompson and preferred that she handle any custodial exchange of their son J. T. Chassity married Thompson in late 2010.

2

In early June 2013, a visit between J. T. and Williams increased tensions. On June 1, Williams and Chassity exchanged heated text messages about Williams taking J. T. to get a haircut.

The next day, Chassity and Thompson went to pick up J. T. at Williams's home, parking their car on the lawn. Chassity sent a text to Williams to send out J. T. After they left, Williams and Chassity exchanged the following text messages:[2]

> WILLIAMS: Ya disrespectful ass. I'm not even gone feed into that. But tell him when he ready for that gangsta s**t get at me. We can get it popping. Coach J.
> CHASSITY: [W]hat are you talking about[?] He pulled in the grass so [J. T.] wouldn't get wet.
> WILLIAMS: If you bring him or send him back over here, I put that on his brother D Rock. I'm going to change his life forever. Play with it and think it's [a game]. Coach J.

Chassity testified that she interpreted Williams's reference to Thompson's brother "D Rock," who was dead, as a threat to put Thompson in the grave with his brother. When Chassity responded that Thompson took care of their son

---

[2] For purposes of clarity, we refer to Chassity's transcribed reading of the text messages. The actual text messages exchanged between Chassity and Williams were admitted into evidence without objection and published to the jury.

while Williams had not and that Williams should be "stepping up to the plate," the following exchange occurred:

> WILLIAMS: I'm through talking. You got the message.
> CHASSITY: [A]in't nobody scared of you. You don't put no fear in my heart. The only thing I fear is my god, and you best do the same. Now you and yours have a good night and we will too.
> WILLIAMS: Get you [a] lot on standby. Pick you [a] good preacher. Try me. I pray you do.
> CHASSITY: I promise you, all I have to do is pray and you'll be in the worst predicament of your life. It happens every time.
> WILLIAMS: You can't touch me. F**k, n***a, I don't worship the devil. If you keep playing, I'm a f**k over your boy.

In response, Chassity relayed Thompson's phone number. Williams wrote in reply, "Send it to Wimberly and Jackson. They gonna need it." Chassity testified that Wimberly and Jackson was a local funeral home.

On June 3, the day after the text message exchange, Thompson pulled his car into a grocery store parking lot where Williams was standing. The two men argued and pushed each other before Thompson walked back to his car. As Thompson was walking away, Williams briefly entered his own car. When he exited, he pointed a firearm at Thompson and started shooting. Thompson began to run but was hit by a bullet and fell to the ground. Thompson got up and tried to get away, but Williams fired another shot into Thompson's back. Thompson

4

fell to the ground again and tried to crawl away, but Williams walked up to Thompson and fired several additional shots at point-blank range. After shooting Thompson, Williams walked back to his vehicle and drove away. Numerous witnesses were present, and a video from the grocery store's surveillance camera recorded the shooting.

A witness testified that after he heard the initial gunshots, he saw Thompson come around the corner and ask for help. The witness then heard Williams repeatedly say to Thompson, "I told you about f**king with me" and "I told you I was going to kill you," as he fired more shots at Thompson. Another witness said that after Thompson fell to the ground, Thompson threw up his hands as though pleading with Williams to stop, but Williams continued to shoot. These witnesses testified that Thompson did not have anything in his hands, and police investigators recovered no weapons from Thompson's vehicle. Thompson died as a result of the gunshot wounds.

Williams claimed self-defense at trial. He testified that Thompson was the aggressor during the encounter at the parking lot because he approached Williams, punched Williams in the face, and threatened to hurt Williams. Williams also testified that, as Thompson was preparing to fight, Thompson

5

said, "let me put this tool up," which Williams explained meant Thompson had a pistol. Williams said he went into his car when Thompson walked away, but Williams could not find his keys. Williams claimed that he exited his car and began firing at Thompson because he saw Thompson approaching, Thompson was a violent person, and he could not fight Thompson since Williams was wearing flip-flops. Williams also said he kept shooting at Thompson because he was nervous and did not know he had hit Thompson since he saw no blood.

1. Although Williams does not challenge the sufficiency of the evidence, we have independently reviewed the record and conclude that the trial evidence was legally sufficient to authorize a rational trier of fact to find beyond a reasonable doubt that Williams was guilty of the crimes for which he was convicted. See Jackson v. Virginia, 443 U.S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979).

2. Williams argues that the trial court erred in denying his request to "shuffle" the jury pool — i.e., call them in an order different from that set by the jury clerk — claiming that it would have ensured a better representation of the community and promoted the jury's impartiality. Although Williams points to cases in which we concluded that a trial court did not abuse its discretion in

6

manipulating the jury pool, he points to no law requiring such action. Therefore, we reject his claim. See Thomason v. State, 281 Ga. 429, 431 (6) (637 SE2d 639) (2006).

3. Williams argues that the trial court erred in excluding certain evidence that supported his self-defense claim. We disagree.

(a) *Prior act of violence by the victim*

The trial court allowed Williams to present some evidence of violent acts by Thompson against third parties, but excluded evidence that Thompson shot a third party when he was a juvenile on the ground that there was a lack of information about the context of the shooting that would allow the court to evaluate its similarity to the present case. Williams challenges this ruling, arguing that the evidence was relevant to show his state of mind when responding to Thompson's purported aggression.

Even if the prior violent act of Thompson was admissible, any error in excluding the evidence was harmless.[3] See Smith v. State, 299 Ga. 424, 431-432

_____

[3] Given our conclusion here that any error was harmless, we need not decide whether and to what extent a victim's prior acts of violence are admissible. See OCGA § 24-4-405 (b) ("In proceedings in which character or a trait of character of a person is an essential element of a charge, claim, or defense or when an accused testifies to his or her own character, proof may also be made of specific instances of that person's conduct."). We have

7

(2) (d) (788 SE2d 433) (2016) (explaining that the harmless error doctrine remains viable under the new Evidence Code). "The test for determining nonconstitutional harmless error is whether it is highly probable that the error did not contribute to the verdict." Id. at 432 (2) (d) (citation and punctuation omitted).

The evidence of Williams's guilt was overwhelming. Several witnesses testified and a video recording confirms that Williams continued to shoot Thompson in the back after Thompson pleaded for his life and attempted to crawl away from Williams. There was no evidence that Thompson was armed. Given this evidence, it is inconceivable that the exclusion of one prior violent act by Thompson, where others were introduced, had any effect on the jury's rejection of Williams's self-defense claim. See Robinson v. State, 277 Ga. 75, 77 (2) (586 SE2d 313) (2003) (no reasonable likelihood that the jury would have accepted defendant's self-defense claim had he called expert to refute evidence that bullet holes in victim's back were entrance wounds where other compelling evidence showed that defendant repeatedly shot victim in the back); see also

held that specific acts of violence are generally inadmissible and left open the question of whether acts of which the defendant was aware are admissible. See Mohamud v. State, 297 Ga. 532, 536 (3) n.2 (773 SE2d 755) (2015).

Parks v. State, 300 Ga. 303, 310 (6) (a) (794 SE2d 623) (2016) (finding it unlikely that the admission of defendant's prior convictions contributed to the verdict where physical evidence showed defendant shot unarmed victim 18 times and defendant admitted he fled the scene).

(b) *Evidence that Thompson was first person to give Williams a gun*

Williams also argues that the court erred in excluding evidence that Thompson was the first person to show Williams how to use a gun. Williams attempted to introduce the evidence at trial as one instance of many prior difficulties between the parties. The trial court allowed some evidence of prior difficulties between the parties, but excluded the evidence about Thompson placing a gun in Williams's hand because it did not demonstrate any difficulty between the two. We agree with the trial court that this evidence did not show a prior difficulty between Thompson and Williams. Nor is the act of giving someone a gun, without more, an act of violence. The court did not err in excluding the evidence.

4. Williams next argues that the trial court erred in denying his motion for a mistrial when the State questioned him about allegations of jury tampering by a third party. We disagree.

During a break in the trial, a sergeant in charge of courthouse security informed the court that James Lawson, the boyfriend of juror Harvey, had approached the sergeant and reported that someone later identified as Anthony Tate had offered to pay Lawson to convince Harvey to acquit Williams. With the consent of Williams and the State, the trial court dismissed Harvey from the jury, citing an earlier incident in which Harvey was in the courtroom rather than the jury room when the parties arrived for court proceedings, and left open the possibility of exploring the jury tampering issue at a later time.

During its cross-examination of Williams, the State asked Williams whether he was aware that his friend Tate attempted to bribe a juror. Williams objected and moved for a mistrial. The State argued it had a good-faith basis for asking the question based on Lawson's statements to court security, and denied that it was making an allegation that Williams was associated with the bribery. The court denied Williams's motion for a mistrial, told the prosecutor to drop further questioning on the matter, and instructed the jury that the State's question was not evidence and should be ignored. The court also explained to the jury that it had previously excused Harvey from the jury because she was in the courtroom when she should have been in the jury room.

10

Williams argues that the court's curative instruction was insufficient to eliminate the prejudice of the State's improper questioning. OCGA § 17-8-75 states:

> Where counsel in the hearing of the jury make statements of prejudicial matters which are not in evidence, it is the duty of the court to interpose and prevent the same. On objection made, the court shall also rebuke the counsel and by all needful and proper instructions to the jury endeavor to remove the improper impression from their minds; or, in his discretion, he may order a mistrial if the prosecuting attorney is the offender.

Absent a manifest abuse of discretion, we will not interfere with the court's determination as to whether a curative instruction will suffice to remedy the prejudicial matter or whether a mistrial is necessary. See Turner v. State, 299 Ga. 720, 723 (5) (791 SE2d 791) (2016); Sanders v. State, 290 Ga. 445, 448-449 (3) (721 SE2d 834) (2012). If a court elects to give a curative instruction, we will not grant a new trial unless it is clear that the court's instruction failed to eliminate the effect of the prejudicial comment. See Turner, 299 Ga. at 723 (5).

The State's question was limited to one sentence and was promptly objected to by counsel. The court instructed the jury to ignore the question, that the State's question was not evidence, and that juror Harvey had been dismissed for matters unrelated to jury tampering. Given the strength of the case against

11

Williams, and the fact that the jury acquitted Williams on three charges, we find it highly improbable that the State's single question contributed to the jury's verdict. See O'Neal v. State, 288 Ga. 219, 223 (2) (702 SE2d 288) (2010) (highly improbable that failure to give curative instruction contributed to the verdict given overwhelming evidence and the fact that the jury was unable to reach a verdict on two counts); Adams v. State, 260 Ga. 298, 300 (1) (392 SE2d 866) (1990) (highly improbable that State's comment that sequestration of jurors would prevent one of defendant's associates from "buying . . . them off" contributed to the verdict).

5. Williams argues that the court erred in refusing to give the jury a requested charge on involuntary manslaughter, because there was evidence that he committed an unlawful act that was not a felony — either reckless conduct or pointing a pistol at another — that caused Thompson's death without the intent to do so. See OCGA § 16-5-3 (a) ("A person commits the offense of involuntary manslaughter in the commission of an unlawful act when he causes the death of another human being without any intention to do so by the commission of an unlawful act other than a felony."). We disagree.

12

Although Williams did point the firearm at Thompson, there is not a shred of evidence that Williams's firearm discharged accidentally or that his actions were reckless. Instead, his actions were intentional. Compare State v. Springer, 297 Ga. 376, 379 (1) (774 SE2d 106) (2015) (the crime of reckless conduct is "an act of criminal negligence, rather than an intentional act, that causes bodily harm or endangers the bodily safety of another." (citation and punctuation omitted)). Williams admitted that he intentionally shot the victim. Thus, a charge under OCGA § 16-5-3 (a) was not warranted. See Harris v. State, 272 Ga. 455, 456-457 (3) (532 SE2d 76) (2000) (where defendant admits he intentionally shot the victim, albeit in self-defense, a charge on the lesser offense of involuntary manslaughter is not warranted because "[t]he intentional use of a gun[,] the deadly force of which is known to all[,] is simply inconsistent with the lack of intent to kill which is a prerequisite in involuntary manslaughter" (punctuation omitted)); Bennett v. State, 254 Ga. 162, 163-164 (2) (326 SE2d 438) (1985) (involuntary manslaughter charge not warranted where defendant admitted he intentionally fired a gun in the direction of the victim).

6. Williams argues that trial counsel was ineffective because there was evidence that counsel abused drugs and alcohol, and counsel's impairment

13

prevented him from introducing evidence in support of Williams's self-defense claim. According to Williams, although trial counsel had prepared an enhanced recording purportedly showing the victim reaching for something in his car after the initial confrontation, trial counsel was unable to play this video for the jury because he could not operate a machine due to his impairment, and never again attempted to introduce this evidence.

In order to establish that trial counsel was ineffective, Williams must show both that trial counsel's performance was deficient, and that the deficient performance prejudiced him to the point that a reasonable probability exists that, but for trial counsel's errors, the outcome of the trial would have been different. Wright v. State, 296 Ga. 276, 284-285 (4) (766 SE2d 439) (2014). There is a strong presumption that trial counsel's performance fell within the range of reasonable professional assistance. Jones v. State, 296 Ga. 561, 567 (4) (769 SE2d 307) (2015). "We accept the trial court's factual findings and credibility determinations unless clearly erroneous, but we independently apply the legal principles to the facts." Wright, 296 Ga. at 285 (4) (citation and punctuation omitted).

The trial court rejected the testimony of Williams's witnesses regarding

14

trial counsel's alleged intoxication during the trial. An attorney who served as co-counsel testified that she never detected any sign of impairment from trial counsel during the trial, and that she would have alerted someone if she suspected that trial counsel was impaired or otherwise unfit to try the case.

In any event, Williams has not shown that trial counsel performed deficiently at trial. Williams failed to secure trial counsel's attendance as a witness at the motion for new trial hearing,[4] making it extremely difficult for Williams to overcome the strong presumption that trial counsel's performance was reasonable. See Wright, 296 Ga. at 285 (4). Nevertheless, even if trial counsel was deficient for failing to introduce the enhanced video, there is no reasonable probability that it would have changed the outcome of the trial. Williams did not introduce the enhanced video at the new trial hearing, and co-counsel testified that the content of the enhanced video was the same as that played for the jury with only certain details having been highlighted. Co-counsel said that still images were made from the video, but no image ever showed Thompson carrying a gun. Because the enhanced video would have, at most, only highlighted certain details in the video recording that was played for the

_____

[4] Williams prepared a subpoena but did not serve it on trial counsel.

15

jury, there is no reasonable probability that the outcome of the trial would have been different had the enhanced video been admitted. See <u>Woods v. State</u>, 275 Ga. 844, 849 (3) (d) (573 SE2d 394) (2002) (failure of trial counsel to employ evidence is not prejudicial in absence of showing that evidence would have been relevant and favorable).

<u>Judgment affirmed. All the Justices concur.</u>

Decided August 14, 2017.

Murder. Hall Superior Court. Before Judge Deal.

<u>Richard A. Hunt</u>, for appellant.

16

Lee Darragh, District Attorney, Shiv Sachdeva, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Ashleigh D. Headrick, Assistant Attorney General, for appellee.